TERRITORY OF HAWAII, BY THE PUBLIC UTILITIES COMMISSION OF THE TERRITORY OF HAWAII *v.* MALCOLM M. NARIMATSU AND GLENN SKEEN, AS INDIVIDUALS AND AS PARTNERS DOING BUSINESS AS AIEA TAXI SERVICE, ARTHUR OTHELO AND FRANK ESPIRITU.

NO. 3035.

ARGUED FEBRUARY 1, 1956.     DECIDED MARCH 21, 1956.

TOWSE, C. J., STAINBACK AND RICE, JJ.

OPINION OF THE COURT BY TOWSE, C. J.

The Public Utilities Commission of the Territory of Hawaii sought an injunction to restrain the respondents-appellees from operating as a common carrier of passengers upon the public highways within the City and County of Honolulu without first obtaining a certificate of public

convenience and necessity as required by chapter 82 of the Revised Laws of Hawaii 1945, as amended.

After hearing, the respondents were permanently enjoined from transporting persons who, "without previous call or demand" to or upon the respondents, presented themselves at any intermediate points between Aiea and Honolulu. The Commission now appeals, contending that the respondents' entire operation should have been enjoined.

The cause was submitted to the trial court upon the following admitted facts: Respondents, with the exception of Skeen and Espiritu who are no longer related to the enterprise, operate daily passenger automobile service upon the public highways in the City and County of Honolulu between Honolulu and Aiea, and, each acting in concert with the other respondents, for the price of twenty-five cents per passenger, provides daily service at more or less regular time intervals between said points during the period from 7 o'clock a.m., to 7 o'clock p.m. Passengers on the Honolulu to Aiea trip board the vehicles at the Honolulu terminus located immediately Ewa of the Standard Cab premises at 24 South Pauahi Street. Ninety-five per cent of the passengers on the Aiea to Honolulu trip board the vehicles at the Aiea terminus in front of the Aiea Appliance Store. Prior to entry of the injunction below, the remaining five per cent using the respondents' service between Aiea and Honolulu boarded at intermediate points between the termini. None of the respondents has applied for or obtained a certificate of public convenience and necessity.

Section 4701, Revised Laws of Hawaii 1945, as amended, in so far as applicable, defines a "public utility" as including "* * * every person who may own, control, operate, * * * any * * * equipment * * *, directly or indirectly for public use, for the transportation of passen-

gers * * *; provided, however, the term 'public utility' as used in this chapter: * * * (2) shall not include persons owning or operating taxicabs, as defined herein; * * *.

"The term 'taxicab' as used in this section shall mean and include any vehicle designed to carry passengers, operating for hire solely on call or demand from a fixed stand, and transporting passengers making such call or demand, with or without baggage, on the public highways between such points as may be directed by such passengers."

The sole issue presented is whether the respondents' operation, as detailed above is embraced within the definition of a "taxicab" as that term is defined in section 4701, (*supra*).

We deem it unnecessary to discuss respondents' argument as to whether the legislative history of section 4701, (*supra*) demonstrates that the legislative intent prompting the enactment of the present definition of "taxicab" was to exclude the respondents from the jurisdiction of the Public Utilities Commission, since such legislative intent is clearly expressed in the House Committee Report (House Journal, Special Session, pp. 420, 421, 1949) and the Senate Committee of the Whole Report (Senate Journal, Special Session, p. 367, 1949) both of which read:

"The purpose of this Bill is to make certain that the country to city taxicab is not treated as a common carrier by and under the jurisdiction of the Public Utilities Commission. There are several operators of motor vehicles who operate their vehicles as taxicabs between country areas and Honolulu who, by the very nature of their operation tend to start from the same places, carry the same people, and stop at the same places. It is believed that it is not the intention nor the desire of the legislature

to include these operators under the provisions of the Public Utilities Act."

"As to the general rule applicable in the construction of statutes there can be no doubt. The object is always to ascertain and give effect to the intention of the legislature. 'This intention, however, must be the intention as expressed in the statute, and where the meaning of the language is plain, it must be given effect by the courts; * * *.' 36 Cyc. 1106, 1107." (*Irwin* v. *Ahia,* 29 Haw. 1, 5.) "The intention of the legislature is to be obtained primarily from the language used in the statute. * * * Where the language of the statute is plain and unambiguous there is no occasion for construction and the statute must be given effect according to its plain and obvious meaning." (*Kauai* v. *McGonagle,* 33 Haw. 915, 920.)

Confronted with the plain and unambiguous statutory requirement that "The term 'taxicab' * * * shall mean * * * any vehicle * * * transporting passengers * * * between such points as may be directed by the passengers." (§ 4701, *supra*), we are unable to accept the construction of the statute urged by the respondents because "* * * *quod voluit non dixit.* What was intended was not expressed." (*Castle & Cooke* v. *Luce,* 5 Haw. 321, 324.) "While it is always the aim of courts to so construe statutes as to carry out the intention of the legislature, that intention in order to be given effect must be expressed in the statute or reasonably appear from the language used." (*Territory* v. *Choy Dan,* 20 Haw. 1, 3) ; " 'But a statute should not be extended beyond the fair and reasonable meaning of its terms because of some supposed policy of the law, or because the legislature did not use proper words to express its meaning.' [36 *Cyc.* 1112, 1113.] * * *. *If it has turned out that the application of [the statute]* * * * *has not accomplished but defeated the unexpressed purpose of the legislature the remedy is not with us but*

*with the law-making body.*" (*Honolulu Rapid Transit Co.* v. *Wilder,* 30 Haw. 685, 690.) (Emphasis added.)

From the facts before us, the respondents' vehicles would perhaps more appropriately be termed "jitneys." The distinction between a taxicab and a jitney service was recognized in *Southern Brooklyn Ry. Co.* v. *Schaves,* 387 N. Y. Supp. 939, wherein: "The charge made and collected was one of 5 cents a passenger for conveyance between Sea Gate and Stillwell Avenue, or any portion of that distance. The taxicabs were not hired by one person. Sometimes they were used by but one individual, but often they were used by five. The fare charged was not for the use of the taxicab for the distance traveled, but was for carrying each passenger, and each passenger paid his own fare. In fact, the defendants were operating a jitney service, and their cars were not being used as taxicabs."

We conclude that the portion of the statutory definition requiring that passengers be transported "* * * between such points as may be directed by such passengers" (§ 4701 *supra*) is decisive of the contentions urged by the respondents. In our opinion the plain and obvious meaning of this language requires the respondents to operate in a manner which affords their passengers control over the point at which they board the vehicle and the terminus at which they disembark. The respondents operating as they do between two fixed termini, thus fail to meet the requisites of the statutory definition of "taxicab" (§ 4701, *supra*).

Concluding as we do, that the operation of the respondents are not included within the "taxicab" exception to the jurisdiction of the Public Utilities Commission (§4701, *supra*), their entire operation should have been enjoined below, unless and until they procured a certificate of public convenience and necessity. (Chapter 82, Revised Laws of Hawaii 1945, as amended.)

Remanded for further proceedings in conformity with this opinion.

*Richard K. Sharpless,* Assistant Attorney General (also on the brief), for appellant.

*James A. King (Bouslog & Symonds* with him on the brief), for appellees.

## IN THE MATTER OF HARRIET BOUSLOG SAWYER, ALSO KNOWN AS HARRIET BOUSLOG, AN ATTORNEY AT LAW.

### NO. 3044.

ARGUED MARCH 1, 1956.                    DECIDED APRIL 6, 1956.

TOWSE, C. J., RICE, J., AND CIRCUIT JUDGE MCKINLEY IN PLACE OF STAINBACK, J., DISQUALIFIED.

*Per Curiam.* This is a matter instituted in this court by the Bar Association of Hawaii, an unincorporated association, by a complaint filed herein on July 8, 1954, under former and then in effect Rule 19 of the rules of this court. The complaint alleged as follows:

"I

"That Harriet Bouslog Sawyer, hereinafter referred to as the Licensee, is and at all times hereinafter mentioned continuously has been an attorney at law duly licensed and admitted to practice before all of the courts of the Territory of Hawaii and before the United States District Court for the District of Hawaii, and that the said Licensee is now and during all of said times herein mentioned has been a practitioner before said courts.

"II

"That the said Licensee, while appearing as counsel of record for certain defendants in that certain case in the United States District Court for the District of

Hawaii entitled 'United States of America, Plaintiff, vs. Charles Kazuyuki Fujimoto, et al, Defendants,' being Criminal Number 10495 in said court, during the course of the trial of said case, to-wit, on or about December 14, 1952, did say during a speech to a public gathering in Honokaa, Hawaii, that horrible and shocking things were going on at said trial; that a fair trial was impossible; that all of the rules of evidence were being scrapped so the government could make its case; that the rules of evidence and procedure were made up as the case proceeded; and that unless the trial was stopped in its tracks certain new crimes would be created.

"III

"That said Licensee did during the course of said trial and shortly after rendition of a verdict therein visit a juror who was known by her to be indisposed, and thereafter submitted her affidavit concerning an interview with said juror to the presiding judge under circumstances indicating a failure to comply with standards of professional conduct required of practitioners of law licensed to practice before this Court."
(See Bill of Particulars, *infra.*)

Pursuant to the prayer thereof and to the provisions of said Rule 19, the complaint, contained in this court's secret file number 45, was on July 8, 1954, referred to the committee on legal ethics and unauthorized practice of the supreme court of the Territory of Hawaii.

The said committee to which the matter was referred, subsequently designated and hereinafter referred to as the legal ethics committee, or as the committee, on September 21, 1954, entered an order, requiring the Bar Association of Hawaii, as complainant in the matter, to either file a bill of particulars or amend paragraph "III" of its complaint of July 8, 1954, making more specific its charge

therein set forth; and also requiring that on or before October 15, 1954, Harriet Bouslog Sawyer, also known as Harriet Bouslog, "file such special pleas as she wishes to present with respect to the jurisdiction of the Committee and the sufficiency of the complaint and on or before October 15, 1954 file such information as she wishes to present to clarify her request that the hearing of this matter should be postponed until after disposition of the *Fujimoto* case, supporting such statement by copies of the briefs, excerpts therefrom, or such other information as she deems advisable to show that the matter involved in the complaint filed in the above matter is the same as involved in the appeal of the *Fujimoto* case."

The Bar Association of Hawaii, by A. William Barlow, Esq., attorney, submitted a bill of particulars, dated the 29th day of September, 1954, which excepting the title of court and cause, was and is as follows:

"BILL OF PARTICULARS

"Pursuant to an Order entered on September 21, 1954, by the Legal Ethics Committee, the following Bill of Particulars is hereby furnished:

"1—Copy of the affidavit of HARRIET BOUSLOG, subscribed and sworn to before a notary public on the first day of July, 1953, signed by the Licensee HARRIET BOUSLOG and filed in the United States District Court for the District of Hawaii on July 1, 1953, in the case of United States of America, Plaintiff, vs. Charles Kazuyuki Fujimoto et al., Defendants, Criminal No. 10,495.

" 'AFFIDAVIT OF HARRIET BOUSLOG

" 'TERRITORY OF HAWAII                )
                                                      }   ss.
" 'CITY AND COUNTY OF HONOLULU  {

" 'I, HARRIET BOUSLOG, being first duly sworn, on oath depose and say:

" 'On Friday evening, June 26, 1953, shortly before 6:00 o'clock I received a telephone call at my home from Ellen Fuller Cabreros, sister of David P. Fuller who sat as a juror in the case of *United States* v. *Fujimoto et al.* Mrs. Cabreros asked me if I could come and see her brother; that he was seriously ill.

" 'I went to the Fuller home at 1734 Colburn Street and was taken by Mrs. Cabreros and Mrs. Fuller into the front bedroom where Mr. Fuller was lying in bed. He appeared to be gravely ill.

" 'I talked with his wife, Helen Fuller, in the living room of their home in the presence of Ellen Fuller Cabreros and her friend, Grace Oshiro, and two of the Fuller children. All members of the family present were upset and in tears at the state of Mr. Fuller. Mrs. Fuller stated that she had called a doctor to examine her husband and informed me that her husband had been ill since the return of the verdict, and particularly since early in the morning of Saturday June 20, 1953, the morning after the verdict was returned.

" 'Mrs. Fuller said that on Saturday morning, the day immediately following the verdict of guilty in the Smith Act case, at about five o'clock in the morning, she found her husband on his knees praying, begging God for mercy, saying he had sinned, that he had lied in the eyes of God; that Jack Hall was innocent and the case was a frameup; that Jack Hall is a good man; that those people are doing good for humanity and here someone is trying to block them. She said that in the

time since, her husband had told her that the jury only looked at the Government's case and scarcely talked at all about the defendants' side and their case; that he asked her and the children to forgive him because he had done something wrong and it was too late; he said that one of the jurors said the defendants were innocent, and when the other jurors said, "Guilty, guilty," that juror threw a book across the room and said they just as well forget about it. Mrs. Fuller said that her husband had wanted to go see the Judge and confess that he had lied, and once or twice tried to leave the house but was too upset mentally and physically and unable to leave the house by himself; that he fell and struck his head. She said that she and other members of her family urged him not to do anything, not to go to see the Judge and to forget about it, that he would only get himself in trouble and would get them in trouble, and that he might go to jail.

" 'Mrs. Fuller said that when he tried to leave and was unable to, she and other members of the family put him back in bed and tried to keep him quiet; that he kept shouting and crying and praying saying that the case was a frameup, that he had done wrong, and told the children and her to stay away from him because he was not clean. She said that his condition seemed to get worse and worse as the days went by until on Friday, June 26, 1953, all day he was in bed and did not move or get up at all, and his voice became scarcely a whisper because he was hoarse from the shouting on previous days.

" 'After the conversation with Mrs. Fuller, I went in the bedroom where Mr. Fuller was and asked him if he wished a drink of water. He nodded that he did. During this time, Mrs. Fuller, his sister and her friend were present in the room. Mr. Fuller struggled to talk

and make himself heard but because of his weakened physical condition and the loss of his voice, it was difficult to understand what he said. He stated understandably, however, that he wanted help and wanted to get a clear conscience and get the wrong he had done straightened out.

" 'Shortly after my arrival, a Doctor Chang arrived. I was not present in the bedroom during the conversation between Dr. Chang and Mrs. Fuller, although I could hear the conversation between Dr. Chang and Mrs. Fuller from the living room. After Dr. Chang had talked to Mrs. Fuller, Mrs. Fuller told me that the doctor said after examining her husband that there was nothing physically wrong with him, that he would have to rest in bed, and that it might be necessary to take him to a hospital unless he would get up to go to the bathroom.

" 'After the doctor had left, in the presence of Mrs. Fuller, Mrs. Cabreros and her friend, Grace Oshiro, and Mrs. Fuller's eldest daughter, I gave Mr. Fuller water and he was propped up in bed. Again he tried to talk but seemed to find difficulty in doing so. He said he wanted to talk about the matter and would talk to Jack Hall or anyone at any time to get a clear conscience.

" 'Shortly after this I left, believing Mr. Fuller needed rest. I made arrangements with Mrs. Fuller and Mr. Fuller to come to see him the next day with Jack Hall.

" 'On Saturday morning I was informed by Mrs. Cabreros that her brother was feeling considerably better and wanted to and would be able to see us.

" 'When Mr. Hall and I arrived at the Fuller home about 1:00 o'clock Saturday afternoon, June 27, Mr. Hall put out his hand to Mr. Fuller, Mr. Fuller looked

at Mr. Hall for a long time and finally took his hand. Mr. Hall told Mr. Fuller he did not hold anything against him; that he just wanted Mr. Fuller to get well.

" 'Mr. Fuller said to Mr. Hall that from the talk of guilty by other jurors in the jury room, he believed he had to vote guilty to protect his brothers because he was afraid they would be fired if he did not. Mrs. Fuller said that both of Mr. Fuller's brothers, Leonore and Harry, worked for Isle-Ways. Mr. Fuller said that it wasn't right that they only looked at Government exhibits and not at the defendants' exhibits or case. He said it was a frameup and said he blamed himself. He said that they looked at Government exhibits and any time someone suggested looking at defense exhibits some juror would say, "Later, later", and they never got around to it. He said that he knew and believed the defendants were innocent all the time but was afraid of what would happen if he voted not guilty.

" 'He said that the jury in their deliberations decided that the Communist Party was a conspiracy within the first hour after they began their deliberations. He said that the instruction of the Judge which they used to decide this was the one which told them first to decide whether there was a conspiracy, and they decided the Communist Party was a conspiracy. He said he knew from what he heard the defendants were convicted before the case started on ideas the jurors had before the case started. He said he heard two jurors tell the Judge that they were opposed to Communism during the examination. He said that no secret ballots were taken, so everyone knew how each juror voted. He said some of the jurors said the Government wouldn't bring the charge if it wasn't true. He said that at some time he heard it said that if the defendants weren't convicted it would affect Hawaii's

getting statehood. He said that the jurors on the side of the Government said that anybody who was a member of the Communist Party must know what its purposes are and are guilty.

" 'He said that the jury wanted Kawano's testimony. He said that jurors on the defense side asked for Kawano's testimony to show that none of the defendants ever talked about overthrowing or destroying the government.

" 'He said that one juror said a number of times during the deliberations that he had to go to the Mainland and that they should get it over with.

" 'He said that if he voted for the defendants he was afraid the other jurors would tell about it and it would hurt his family. He said one of the jurors played cards in the jury room. He said that there was anger and shouting in the jury room between the persons who were for the prosecution and those who were for the defense. Particularly the jurors for the prosecution got angry with the ones who were holding out.

" 'He said they didn't take any secret ballot, but anybody on the defendants' side had to speak up and then the others would try to get them to back down. He said that he heard jurors talk about Attorney Gladstein and said he was too smart and that he had defended the Communists in New York and had served a jail sentence. He said that he heard some of the jurors talk about the war against Communism. He said that they didn't consider the character evidence for the defendants.

" 'He said the second thing the jury decided was that all defendants were members of the Communist Party. The next thing they decided was that if they were Communists they must have intended to overthrow the government. He said that he himself did not

believe Kawano and he heard others say they did not believe Muller. He said that after they asked for the instructions they used the one which told them to decide first whether there was a conspiracy, and right off they decided there was, and then talked about whether defendants were members of the Communist Party. He said there was a lot of talk about Bailey.

" 'After this conversation took place, when Jack Hall and I started to leave, Mr. Fuller begged Mr. Hall not to leave and raised his hands above his head and appeared to be praying although the words were not audible. Before leaving, Mr. Hall tried to quiet Mr. Fuller and helped Mrs. Fuller put her husband in bed.

" 'Mr. Hall and I again went to see Mr. Fuller on Sunday, June 28, shortly after 1 :00 o'clock in the afternoon. We were accompanied on this occasion by Joseph Kealalio. When we arrived, Mr. Fuller was sitting in a chair in the living room. He kept looking at Mr. Hall but did not speak.

" 'After conversing with Mrs. Fuller for a very short period of time, we came to the conclusion that it would be better to wait until Mr. Fuller was in better physical and mental condition.

" 'When Mr. Hall started to leave, Mr. Fuller again pleaded with him not to leave.

" 'Further affiant saith not.

" '/s/ Harriet Bouslog

Harriet Bouslog

" 'Subscribed and sworn to before me this 1st day of July, 1953.

" 'SEAL (s) J. D. Marques
Notary Public, First Judicial
Circuit, Territory of Hawaii

" 'My commission expires: July 15/53' "

"The Complainant Bar Association neither affirms nor denies the truth or falsity of the allegations and facts contained in the affidavit filed by the Licensee HARRIET BOUSLOG. The Complainant informs the Committee that the above-recited affidavit, its contents, and the manner in which it was obtained furnishes the basis for the charge against the Licensee HARRIET BOUSLOG and that the Complainant will introduce evidence in elaboration of and in corroboration of the charge indicating a failure by the Licensee HARRIET BOUSLOG to comply with standards of professional conduct required of practitioners before this Court and which unprofessional and unethical conduct is condemned in Opinion 109 issued March 10, 1934 by the Committee on Professional Ethics and Grievances by the American Bar Association and by Judge Prettyman in the case of *Rakes* v. *United States,* 169 F. 2d at pages 745 and 746 and other related cases.

"DATED; Honolulu, T. H., this *29th* day of September, 1954."

By letter dated October 14, 1954, addressed to the chairman of the legal ethics committee, J. Garner Anthony, then attorney for Harriet Bouslog, advised the committee as follows:

"This is to advise you that Mrs. Bouslog will present no special plea to the jurisdiction of the Committee nor does she propose to file any material or argument in support of her prior request for a continuance until the disposition of *Fujimoto, et al* v. *United States,* No. 13195.

"If the Committee believes it appropriate to hear this matter in advance of a determination of the *Fujimoto case,* we are ready to proceed. Our only request is that the matter be heard before the full Committee."

Thereafter proceedings were had before the said com-

mittee and the latter subsequently, to wit, on July 1, 1955, filed herein, under the aforesaid secret file number 45, its report, wherein the committee expressed an unanimous opinion that the Bar Association of Hawaii had sustained the allegations in paragraphs "II" and "III" of its complaint; that in her comments made at Honokaa (as alleged in paragraph "II" of the complaint) the respondent licensee ("Mrs. Bouslog") imputed to the judge unfairness in the conduct of the trial (of the case of United States of America, Plaintiff, v. Charles Kazuyuki Fujimoto, et als., Defendants, Criminal 10495, United States District Court for the District of Hawaii) ; impugned the integrity of the local Federal courts and made other comments. and thus was guilty of violation of canons 1 and 22 of the canons of professional ethics of the American Bar Association and should be disciplined for the same; also, that there were * * * "differences of opinion within the Committee as to whether her interviews with juror Fuller were proper, as to whether they were in violation of Canon 23 of the Canons of Ethics and as to whether she should be disciplined, although the majority thinks she should be disciplined with respect to the charges in paragraph III" of the complaint.

Attached to and submitted with the report of the committee was a separate written statement by one member of the committee, wherein he expressed concurrence in the findings of the committee that the conduct of the respondent licensee was, with respect to the Honokaa speech and with respect to the matters concerning the juror, improper; and non-concurrence in the conclusion of the other members of the committee with respect to. the recommendations the committee should make to the court; and expressing his view that the then rule 19 of the rules of this court required that the committee, when recommending disciplinary action should go further and recom-

mend "the *nature* of the discipline it feels is proper." He recommended that, "for the improper conduct of Mrs. Bouslog with reference to the Honokaa speech, she be suspended from the practice of law for such period of time as the Court may deem just and proper"; and that for her conduct regarding the juror which the committee had found improper "she be reprimanded."

Included with the report of the said committee and therewith returned secret file number 45 were: the complaint of the Bar Association of Hawaii against the licensee; the pleadings and memoranda which had been filed since the complaint, to wit, petitioner's (Bar Association of Hawaii's) exhibits 1, 2 and 6 and licensee's exhibits B, C, D, E, F and G introduced at the hearings before the committee, with the notation by the chairman of the committee that petitioner's exhibits 3, 4 and 5, copies of newspapers presented at the hearing before the committee on December 2, 1954, were subsequently withdrawn.

After consideration of the said committee's report, on July 8, 1955, this court issued to said licensee, Harriet Bouslog Sawyer, also known as Harriet Bouslog, an order to show cause, if existing, why the findings, conclusions and recommendations of the committee should not be adopted. Then, the matter was removed from the secret file as number 45 thereof and became number 3044 of the regular files of this court.

By order of court dated the 8th day of July, 1955, and filed herein on July 12, 1955, attorney A. William Barlow, member of the Bar of this court, was designated to, in conjunction with the attorney general of the Territory of Hawaii, present the cause on behalf of the complainant, the Bar Association of Hawaii.

On July 27, 1955, by order of the Chief Justice of this court the licensee was granted an extension of time to September 19, 1955, within which to answer the order to

show cause theretofore issued. Subsequently, upon motions or requests on her behalf, further extensions of time were granted to the licensee to and including November 7, 1955, within which to file her return to the order to show cause and hearing on the latter was set for November 8, 1955.

On October 19, 1955, J. Garner Anthony, Esq., who had been of counsel for licensee at hearings before the committee and herein, filed a withdrawal as counsel, such bearing date of October 18, 1955.

On October 19, 1955, the licensee, therein referred to as "respondent" — "by way of return to the order to show cause issued on July 8, 1955" — moved to dismiss the order to show cause, upon several grounds therein set forth. Such motion was contested, a memorandum in opposition thereto having been filed on behalf of the complainant on October 26, 1955. To the latter a memorandum in opposition was filed on October 28, 1955. Argument on the motion and pertinent memoranda was heard, in open court, on November 3, 1955, before the Chief Justice and Justices Stainback and Rice. At the conclusion of the argument the motion was by the court denied, the Chief Justice dissenting in part and concurring in part.

The licensee (as respondent) was then granted to and including November 7, 1955, within which to file her return to the order to show cause and hearing thereon was set for November 8, 1955.

On November 4, 1955, conference was had between the justices and counsel upon a request that additional time be granted to the licensee to obtain mainland counsel to represent her. At the conclusion of such conference the return to the order to show cause was set forward to December 2, 1955, and argument on the case set for January 9, 1956, at 9:00 A. M.

A motion for reconsideration was filed on November 7, 1955, by Myer C. Symonds, Esq., on behalf of the licen-

see. Such motion was argued on November 14, 1955, before this court, consisting of the Chief Justice and Justices Stainback and Rice.

On November 29, 1955, there was entered and filed an order denying the motion to dismiss the order to show cause, Chief Justice Edward A. Towse dissenting in part upon the ground that the charges premised upon the Fuller affidavit should be dismissed "as an interference with the administration of justice in the United States District Court for the District of Hawaii and a possible usurpation of the power thereof."

On December 2, 1955, there was filed on behalf of the licensee, by Myer C. Symonds, Esq., her attorney, a return to the order to show cause.

On December 7, 1955, there was filed, on behalf of the licensee, a motion for continuance, together with a notice thereof, the motion being based upon an affidavit of John T. McTernan, Esq., and an affidavit of Harriet Bouslog, the licensee.

On December 12, 1955, argument was had on the said motion for continuance filed on December 7, 1955. The motion was denied and the court reiterated that the hearing on the order to show cause would stand as previously set for hearing on January 9, 1956, at 9:00 A. M.

On January 9, 1956, a pretrial conference was had in the chambers of the Chief Justice, he being present and also Justices Stainback and Rice, as the court, and Attorney General Edward N. Sylva, Deputy Attorney General Morio Omori, and A. William Barlow, Esq., on behalf of the complainant, and attorneys John T. McTernan and Myer C. Symonds, on behalf of the respondent licensee. Subsequent to said first pretrial conference, to wit, on January 11, 1956, there were filed on behalf of the respondent licensee a suggestion of disqualification of Mr. Justice Stainback and also a suggestion of disqualifica-

tion of Mr. Justice Rice, the two associate justices of this court. A memorandum in opposition to said suggestions of disqualification of the justices was filed on behalf of the Bar Association of Hawaii by the attorneys above named as appearing on its behalf at the pretrial conference on January 9, 1956.

Argument on the two suggestions of disqualification and the memorandum in opposition thereto was set for January 12, 1956, but was continued to and heard on January 16, 1956, and at the conclusion thereof the subject matter was taken under advisement.

Subsequently — see opinion of the court by Stainback, J., concurring opinion of Rice, J., and dissenting opinion of Towse, C. J., filed together on January 19, 1956 — the court rejected the affidavits upon which the suggestions for disqualification were based and held: "that neither Mr. Justice Stainback nor Mr. Justice Rice is disqualified," for reasons set forth and summarized as follows:

"1—The provisions of section 9573 of the Revised Laws of Hawaii 1945 relating to disqualification of judges because of bias or prejudice are not applicable to justices of the supreme court; however, a justice in addition to being disqualified by reason of relationship, pecuniary interest or previous judgment as set forth in section 84 of the Organic Act, may excuse himself from participating in a case where he feels that fairness and justice require such withdrawal."

"2—The suggestions of disqualification of the justices for bias or prejudice were not timely made; in fact, not until after affiant had received an adverse ruling on the sufficiency of the complaint did she make her affidavit of bias and prejudice against the two justices ruling against her. Would it be unreasonable or unfair to infer that these affidavits were made because she had tried the "pool of litigation" with her

toe and found it too cool for a plunge, as did the little boy testing the temperature of the water? (*State* v. *Armijo, supra.*)

"3—The affidavit attempting to disqualify Mr. Justice Stainback is at least technically defective and that referring to Mr. Justice Rice is not only technically defective but does not in the remotest degree set forth any facts which would show such personal bias or prejudice against the affiant."

However, because of a statement which he had previously made to a committee of the United States Senate (which he quoted in the aforesaid opinion of the court by him) Mr. Justice Stainback said: "I, therefore, shall take no part in the hearings of this matter [the proceedings herein against the respondent licensee] upon its merits but respectfully suggest that a substitute be selected to serve in my stead."

Mr. Justice Stainback having withdrawn, pursuant to the provisions of law, the remaining justices, the Chief Justice and Mr. Justice Rice, requested and authorized the Honorable Frank A. McKinley, fourth judge of the circuit court of the first circuit, Territory of Hawaii, to sit with them temporarily in place of Associate Justice Ingram M. Stainback, to hear and determine this said cause, commencing on January 20, 1956.

Therefore, from and inclusive of January 20, 1956, and throughout the remainder of proceedings herein, this court was comprised of Mr. Chief Justice Edward A. Towse, Mr. Justice Philip L. Rice, and Circuit Judge Frank A. McKinley, the latter substituting for Mr. Justice Stainback.

Before the court as comprised as last aforesaid, pretrial hearings, at which were present A. William Barlow, Esq., attorney for the Bar Association of Hawaii; Honorable Edward N. Sylva, Attorney General, Territory of Hawaii; and John T. McTernan, Esq., and Myer C.

Symonds, Esq., attorneys for the respondent licensee, were held on January 20 and 23, 1956. Thereat it was determined that from the filing with this court of the report of its said legal ethics committee and the thereupon issuance of this court's order to the respondent licensee to show cause, if existing, the proceedings instituted by the Bar Association of Hawaii against the said respondent licensee had come before this court for trial *de novo*. Also that, in lieu of the taking anew of testimony and evidence in this proceeding before this court, the cause would, the respondent licensee consenting through her attorneys, be submitted upon the record which had been developed by and before the aforesaid committee and this court would file a pretrial order conformable to such determination.

On February 6, 1956, the pretrial order was entered and filed.

It was thereby ordered:

"1. The record upon which this matter is to be submitted to the Court and determined by it is the following:

"a. The Complaint of the Bar Association of Hawaii, dated July 8, 1954.

"b. The Bill of Particulars submitted by the Bar Association of Hawaii dated September 29, 1954.

"c. The Report of the Legal Ethics Committee to this Court dated June 9, 1955.

"d. The Order to Show Cause made and entered by this Court on July 8, 1955.

"e. The Return to the Order to Show Cause of Harriet Bouslog, respondent, dated December 2, 1955.

"f. The transcript of all proceedings before said Legal Ethics Committee, including the testimony adduced and the exhibits offered and received.

"g. And all motions, briefs and memoranda of law heretofore filed with this Court herein.

"2. The Court will consider the matter, as submitted on the record, disregarding those portions thereof not bearing on the charges set forth in the said Complaint.

"3. The parties hereto will file and exchange briefs on or before February 23, 1956.

"4. The Court will hear oral argument on Thursday, March 1, 1956, beginning at 9:00 o'clock A. M."

Pursuant to the pretrial order, *supra,* the entire record specified therein, with the transcript of oral testimony presented before and heard and the exhibits admitted in evidence by the said legal ethics committee has and have been submitted to this court for scrutiny and evaluation; the parties filed and exchanged briefs on February 23, 1956, and oral argument was heard in open court on March 1, 1956. At the conclusion of the oral argument the matter was taken under advisement by this court.

This court has scrutinized the record, the transcript of oral testimony and the exhibits aforesaid, read the briefs filed, examined the cases cited therein, and considered them with the oral arguments presented on March 1, 1956, and has since made its own evaluation thereof, inclusive and particularly of the evidence, and has drawn its own conclusions therefrom, unprejudiced by the report of the legal ethics committee, which made no comment on the relative credibility accorded by such committee to the witnesses, severally, or the weight given by the committee to the exhibits.

The court has noted in the record and particularly in the transcript of her testimony that the respondent licensee has exhibited an evasiveness and a lack of frankness as to her actions and sayings which were under investigation and inquiry. When confronted with testimony of witnesses

who were of her audience at her speech in Honokaa, Hawaii, on or about December 14, 1952, and which testimony was to the effect that she had made the statements attributed to her in paragraph "II" of the complaint of the bar association, she did not categorically deny making such statements, but equivocated by saying in effect that she had no recollection of making them and also that they were not indicative of language she would have used. However, she admitted authorship of the pamphlet, entitled "Fear," a copy of which was admitted in the proceedings before the legal ethics committee and is a part of the record, as exhibit 6 and comparison of the language used therein with the language attributed to her in her Honokaa speech reveals great similarity.

It is the finding and conclusion of this court that the allegations contained in the complaint of the Bar Association of Hawaii, more particularly paragraphs "I," "II," and "III" thereof and the aforesaid bill of particulars pertinent to the last mentioned, have been sustained by convincing proof, by credible evidence of more than a mere preponderance; that the said respondent licensee, a member of the Bar of this court and an attorney at law, duly licensed and admitted to practice before all of the courts of the Territory of Hawaii and, also, before the United States District Court for the District of Hawaii, did, as charged in said paragraph II, being then an attorney of record for a defendant in a then pending case in the United States District Court for the District of Hawaii entitled "United States of America, Plaintiff, vs. Charles Kazuyuki Fujimoto, et al, Defendants," being criminal number 10495 in said court, during the course of trial of said case, to wit, on or about December 14, 1952, say during a speech to a public gathering in Honokaa, Hawaii, that horrible and shocking things were going on at said trial; that a fair trial was impossible; that all of the rules of

evidence were being scrapped so the government could make its case; that the rules of evidence and procedure were made up as the case proceeded; and that unless the trial was stopped in its tracks certain new crimes would be created. Also, that, as charged in said paragraph III and the bill of particulars pertinent thereto, said licensee did — at the request of the juror's sister — shortly after rendition of a verdict in said case visit a juror and interrogated him, David P. Fuller, known to licensee as being indisposed, with respect to what may have transpired in the jury room, when the jury was therein for the purpose of considering the evidence and arriving at a verdict in the said case, which interviewing of the said juror was set forth in a subsequent affidavit by the said licensee, a copy of which was and is incorporated in the aforesaid bill of particulars with respect to said paragraph III of the complaint of the bar association.

Upon its finding and conclusion as stated *supra*, this court deems that in saying what she did in her speech to a public gathering at Honokaa, Hawaii, on December 14, 1952, as aforesaid, when there was then pending in the United States District Court for the District of Hawaii a case under the Smith Act, to wit, the case entitled "United States of America, Plaintiff, vs. Charles Kazuyuki Fujimoto, et als, Defendants," being criminal number 10495 in said court, she engaged and participated in a willful oral attack upon the administration of justice in and by the said United States District Court for the District of Hawaii and by direct statement and implication impugned the integrity of the judge presiding therein and in the said pending case, within the territorial boundaries of the Territory of Hawaii, and thus tended to also create disrespect for the courts of justice and judicial officers generally, contra to the obligations and duties assumed, as incident to the license, by her and by every person to

whom a license has or shall have been issued by this court to practice in the courts of the Territory of Hawaii. She has thus committed what this court considers gross misconduct.

Wherefore, in the exercise of its inherent and statutory disciplinary power, this court orders that, for one year commencing from and next succeeding the entry of judgment herein, the said Harriet Bouslog Sawyer, also known as Harriet Bouslog, be suspended and prohibited from practice — either directly or indirectly and in any manner — in all and every one of the courts of the Territory of Hawaii, as an attorney at law, counsellor, solicitor and proctor thereof; and that she also pay all costs and expenses incurred in, or incident to, the proceedings herein.

It is further ordered: that, the said Harriet Bouslog Sawyer, also known as Harriet Bouslog, forthwith surrender to a clerk of this court the license heretofore issued by the court to her, dated December 23, 1941, and that said clerk thereupon place and retain such license, together with a certified copy hereof in an appropriately marked file of the court; also, that upon entry of judgment herein, an appropriate entry thereof be made in and upon the roll of attorneys licensed by this court to practice in all courts of the Territory of Hawaii.

It appears from the transcript which we have examined pursuant to the pretrial order herein, that her first visit to said David Fuller was made by the respondent licensee upon request by his sister. It also appears that it has not been uncommon, if not in fact common practice, heretofore and within the Territory of Hawaii, for attorneys as well as others to interrogate jurors, after rendition of verdict by them, as to what may have been decisive in reaching a verdict.

However, even if she relied upon the request of his sister when she first visited David Fuller, and upon a belief that it was common practice, locally, to interrogate trial jurors after verdict, such reliance thereon is not acceptable as excuse for her repeated visits to and studied interrogation of Fuller under the circumstances and as set forth in her affidavit, incorporated in the bill of particulars. In this connection, we quote from and adopt as a declaration of the view of this court, the following extract from the opinion of the court in *Rakes* v. *United States,* 169 F. (2d) 739 (4th Cir. 1948) :

"We are impelled to add a further word upon this matter. The inviolability of the jury room from outside influence of any sort, actual or potential, is a prime necessity in the administration of justice. That unqualified rule requires that if a person, whether on the jury or not, knows of such outside influence, or an attempt at it, he must at once report his information to the court. The same rule requires that jurors are not to be harassed in any manner because of a verdict they have rendered. If jurors are conscious that they will be subjected to interrogation or searching hostile inquiry as to what occurred in the jury room and why, they are almost inescapably influenced to some extent by that anticipated annoyance. The courts will not permit that potential influence to invade the jury room. He who makes studied inquiries of jurors as to what occurred there acts at his peril, lest he be held as acting in obstruction of the administration of justice. Much of such conversation and inquiry may be idle curiosity, and harmless, but a searching or pointed examination of jurors in behalf of a party to a trial is to be emphatically condemned. It is incumbent upon the courts to protect jurors from it."

Let it be known that one acts at his peril: (1) who within the jurisdiction of the courts of the Territory of Hawaii hereafter, either directly or indirectly, without good cause shown to and express authorization of a court of record, or a judge thereof, interrogates one who has been, as well, as one then being, a juror of a trial jury in any case, as to any occurrence in the room wherein and during the time when the trial jury shall be, or have been, secluded therein for the purpose of conference or deliberation and an endeavor to reach a verdict; or (2) who shall after verdict interrogate one, who has been a juror of any said jury, as to what may have been persuasive in reaching the verdict, or upon what the jury based it.

However, in the instant matter, this court will let its hereinbefore expressed disciplinary order — suspending the said respondent licensee from the practice of law in the territorial courts for one year and requiring her to pay costs — suffice, although also deeming gross misconduct her said repeated interviews with and interrogations of David Fuller.

Is has been indicated to this court that as the proceedings herein have been with respect to the conduct — which we have found to be gross misconduct — of the respondent licensee, the said Harriet Bouslog Sawyer, also known as Harriet Bouslog, in connection with or relation to a case in a Federal court, to wit, the case of the "United States of America, Plaintiff, vs. Charles Kazuyuki Fujimoto, et als, Defendants," criminal number 10495, in the United States District Court for the District of Hawaii, this Supreme Court of the Territory of Hawaii should not have taken cognizance thereof and assumed and exercised jurisdiction in the instant matter.

We cannot accept that view of the situation. The respondent licensee is a member of the Bar of this and all other courts of the Territory of Hawaii, by virtue of a

license issued to her by the Supreme Court of the Territory of Hawaii which license was by the express language thereof to be in effect "during good behavior." Therefore, the behavior of the respondent licensee as an attorney is ever a concern of the licensing court. See *In re Isserman*, 9 N. J. 269, 87 A. (2d) 903.

Appended hereto and by reference incorporated herein and made a part hereof is a memorandum of other cases in re disciplinary proceedings against attorneys, which cases — as well as others — have had our consideration in connection with the instant matter.

Let judgment be entered pursuant hereto and in conformity herewith.

*A. William Barlow* (also on the briefs) for the Bar Association of Hawaii, complainant.

*Edward N. Sylva*, Attorney General, and *Morio Omori*, Deputy Attorney General (also on the briefs) for the Territory.

*John T. McTernan* and *Myer C. Symonds* (also on the briefs) for respondent-licensee Harriet Bouslog Sawyer, also known as Harriet Bouslog.