IN RE SAWYER.

No. 326.   Argued May 19–20, 1959.—Decided June 29, 1959.

*John T. McTernan* argued the cause and filed a brief for petitioner.

*A. William Barlow,* attorney for the Bar Association of Hawaii, argued the cause for respondent. With him on the brief was *Morio Omori,* Special Deputy Attorney General of the Territory of Hawaii.

*Joseph A. Forer* filed a brief for the National Lawyers Guild, as *amicus curiae,* urging reversal.

MR. JUSTICE BRENNAN announced the judgment of the Court, and delivered an opinion, in which THE CHIEF JUSTICE, MR. JUSTICE BLACK, and MR. JUSTICE DOUGLAS join.

This case is here on writ of certiorari, 358 U. S. 892, to review petitioner's suspension from the practice of law for one year, ordered by the Supreme Court of the Territory of Hawaii, 41 Haw. 403, and affirmed on appeal by the Court of Appeals for the Ninth Circuit, 260 F. 2d 189.[1] Petitioner has been a member of the Territorial Bar in Hawaii since 1941. For many months beginning in late 1952 she participated, in the United States District Court at Honolulu, as one of the defense counsel in the trial of an indictment against a number of defendants for conspiracy under the Smith Act, 18 U. S. C. § 2385. The trial was before Federal District Judge Jon Wiig and a jury. Both disciplinary charges against petitioner had to do with the Smith Act trial. One charge related to a speech she made about six weeks after the trial began. The speech was made on the Island of Hawaii, at Honokaa, a village some 182 miles from Honolulu, Oahu, on a Sunday morning. The other charge related to interviews she had with one of the jurors after the trial concluded.

---

[1] The affirmance was by a 4–3 vote. The appeal was heard *en banc* by 9 judges but was decided by 7 because of the retirement of one judge and the death of another.

The Bar Association of Hawaii preferred the charges [2] which were referred by the Territorial Supreme Court to the Association's Legal Ethics Committee for investigation. The prosecutor who represented the Government at the Smith Act trial conducted the investigation and presented the evidence before the Committee. The Committee submitted the record and its findings to the Territorial Supreme Court. Because the suspension seems to us to depend on it, see pp. 637–638, *infra,* we deal first with the charge relating to the speech. The gist of the Committee's findings was that the petitioner's speech reflected adversely upon Judge Wiig's impartiality and fairness in

---

[2] At the conclusion of the Smith Act trial, District Judge Wiig requested the local Bar Association to investigate the conduct of petitioner. The Bar Association took no action as the Attorney General of the Territory conducted an investigation. As the Rules of the Supreme Court of the Territory then stood, only the Attorney General or a person aggrieved could file charges of unprofessional conduct against an attorney. After investigating the matter, the Attorney General did not file a complaint. A Committee of the Bar Association then proceeded to study the question of bringing charges against petitioner, and, in the words of the then President of the Association:

"The committee subsequently made a report to the Executive Board of the Association, ruling that a complaint be filed against Mrs. Bouslog. However, under the rules then in existence—that is, the rules of the Supreme Court, the Bar Association could not be a complainant. Consequently, the matter was again referred to the Committee on Legal Ethics to study amendments to the Rules of the Supreme Court, and the Chairman of the Committee on Legal Ethics took the matter up with the Chief Justice. And as I recall, the amendment to Rule 19—that is the rule on complaints for unprofessional conduct—I think was amended in April of 1954.

"Thereafter, the chairman of the Committee on Legal Ethics submitted a proposed draft of the Complaint. The Executive Board studied the draft, recommended certain changes, and then, finally, the form of the complaint was, as filed, was [*sic*] agreed upon, and I, as president of the Bar Association, was authorized to file that complaint in the name of the Bar Association."

the conduct of the Smith Act trial and impugned his judicial integrity. The Committee concluded that petitioner "in imputing to the Judge unfairness in the conduct of the trial, in impugning the integrity of the local Federal courts and in other comments made at Honokaa, was guilty of violation of Canons 1 and 22 of the Canons of Professional Ethics of the American Bar Association [3] and

---

[3] Canon 1 is entitled "The Duty of the Lawyer to the Courts." It reads:

"It is the duty of the lawyer to maintain towards the Courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance. Judges, not being wholly free to defend themselves, are peculiarly entitled to receive the support of the Bar against unjust criticism and clamor. Whenever there is proper ground for serious complaint of a judicial officer, it is the right and duty of the lawyer to submit his grievances to the proper authorities. In such cases, but not otherwise, such charges should be encouraged and the person making them should be protected."

Canon 22 is entitled "Candor and Fairness." It reads:

"The conduct of the lawyer before the Court and with other lawyers should be characterized by candor and fairness.

"It is not candid or fair for the lawyer knowingly to misquote the contents of a paper, the testimony of a witness, the language or the argument of opposing counsel, or the language of a decision or a textbook; or with knowledge of its invalidity, to cite as authority a decision that has been overruled, or a statute that has been repealed; or in argument to assert as a fact that which has not been proved, or in those jurisdictions where a side has the opening and closing arguments to mislead his opponent by concealing or withholding positions in his opening argument upon which his side then intends to rely.

"It is unprofessional and dishonorable to deal other than candidly with the facts in taking the statements of witnesses, in drawing affidavits and other documents, and in the presentation of causes.

"A lawyer should not offer evidence which he knows the Court should reject, in order to get the same before the jury by argument for its admissibility, nor should he address to the Judge arguments upon any point not properly calling for determination by him. Neither should he introduce into an argument, addressed to the

should be disciplined for the same." . The Territorial Supreme Court held that ". . . she engaged and participated in a willful oral attack upon the administration of justice in and by the said United States District Court for the District of Hawaii and by direct statement and implication impugned the integrity of the judge presiding therein . . . and thus tended to also create disrespect for the courts of justice and judicial officers generally. . . . She has thus committed what this court considers gross misconduct." 41 Haw., at 422–423.

We think that our review may be limited to the narrow question whether the facts adduced are capable of supporting the findings that the petitioner's speech impugned Judge Wiig's impartiality and fairness in conducting the Smith Act trial and thus reflected upon his integrity in the dispensation of justice in that case. We deal with the Court's findings, not with "misconduct" in the abstract. Although the opinions in the Court of Appeals and the argument before us have tended in varying degrees to treat the petitioner's suspension as discipline imposed for obstructing or attempting to obstruct the administration of justice, in a way to embarrass or influence the tribunal trying the case, such was neither the charge nor the finding of professional misconduct upon which the suspension was based. Since no obstruction or attempt at obstruction of the trial was charged, and since it is clear to us that the finding upon which the suspension rests is not supportable by the evidence adduced, we have no occasion

court, remarks or statements intended to influence the jury or bystanders.

"These and all kindred practices are unprofessional and unworthy of an officer of the law charged, as is the lawyer, with the duty of aiding in the administration of justice."

We do not perceive any specification by the Committee of the respect in which Canon 22 was thought to have been violated by petitioner's speech, and such a violation does not occur to us.

to consider the applicability of *Bridges* v. *California,* 314 U. S. 252; *Pennekamp* v. *Florida,* 328 U. S. 331; or *Craig* v. *Harney,* 331 U. S. 367, which have been extensively discussed in the briefs. We do not reach or intimate any conclusion on the constitutional issues presented.

Petitioner's clients included labor unions, among them the International Longshoremen's and Warehousemen's Union. Some of the defendants in the Smith Act trial were officers and members of that union and their defense was being supported by the union. The meeting at Honokaa was sponsored by the ILWU and was attended in large part by its members. The petitioner spoke extemporaneously and no transcript or recording was made of her speech. Precisely what she did say is a matter of dispute. Neither the Territorial Supreme Court nor the Court of Appeals saw the witnesses, but both courts, on reading the record, resolved matters of evidentiary conflict in the fashion least favorable to the petitioner. For the purposes of our review here, we may do the same. The version of the petitioner's speech principally relied upon by the Court of Appeals, 260 F. 2d, at 197–198, is derived from notes made by a newspaper reporter, Matsuoka, who attended the meeting and heard what the petitioner said. These were not Matsuoka's original notes—the originals were lost—but an expanded version prepared by him at the direction of his newspaper superiors after interest in the speech was aroused by Matsuoka's account of it in the newspaper.[4] We

---

[4] The portion of the article, in the Hilo Tribune-Herald, that deals with petitioner's speech is as follows:

"Mrs. Sawyer, speaking for a half hour, spoke of 'some rather shocking and horrible things that go on at the trial.'

"There's 'no such thing as a fair trial in a Smith act case,' she charged. 'All rules of evidence have to be scrapped or the government can't make a case.'

set forth the notes in full as an Appendix to this opinion, and summarize them here, as an account of what petitioner said. The summary will illumine the basis of our conclusion that the finding that the petitioner's speech impugned the integrity of Judge Wiig or reflected upon his impartiality and fairness in presiding at the Smith Act trial is without support. The fact finding below does not remove this Court's duty of examining the evidence to see whether it furnishes a rational basis for the characterization put on it by the lower courts. See *Fiske* v. *Kansas*, 274 U. S. 380. Speculation cannot take over where the proofs fail. We conclude that there is no support for any further factual inference than that petitioner was voicing strong criticism of Smith Act cases and the Government's manner of proving them, and that her references to the happenings at the Honolulu trial were illustrative of this, and not a reflection in any wise upon Judge Wiig personally or his conduct of the trial.

Petitioner said that the Honolulu trial was really an effort to get at the ILWU. She wanted to tell about some "rather shocking and horrible things that go on at the trial." The defendants, she said, were being tried for reading books written before they were born. Jack Hall, one of the defendants, she said, was on trial because he had read the Communist Manifesto. She spoke of the nature of criminal conspiracy prosecutions, as she saw

"They just make up the rules as they go along," she told her listeners.

" 'Unless we stop the Smith act trial in its tracks here' there will be a 'new crime' that of knowing what's in books and will lead to 'dark ages of thought control,' asserted the chic and attractive woman lawyer.

"She referred to reading by the prosecution of books 'supposed to have been in a duffel bag' owned by a witness; Henry Johnson. She urged her listeners to tell others 'what a vicious thing the Smith Act is.' 'Persons are 'tried for books written years ago' by others, she said.' "

them, and charged that when the Government did not have enough evidence "it lumps a number together and says they agreed to do something." "Conspiracy means to charge a lot of people for agreeing to do something you have never done." She generally attacked the FBI, saying they spent too much time investigating people's minds, and next dwelt further on the remoteness of the evidence in the case and the extreme youth of some of the defendants at the time to which the evidence directly related. She said "no one has a memory that good, yet they use this kind of testimony. Why? Because they will do anything and everything necessary to convict." Government propaganda carried on for 10 years before the jurors entered the box, she charged, made it "enough to say a person is a communist to cook his goose." She charged that some of the witnesses had given prior inconsistent testimony but that the Government went ahead and had them "say things in order to convict." "Witnesses testify what Government tells them to." The Government, she claimed, read in evidence for two days Communist books because one of the defendants had once seen them in a duffel bag. Unless people informed on such defendants, the FBI would try to make them lose their jobs. "There's no such thing as a fair trial in a Smith Act case. All rules of evidence have to be scrapped or the Government can't make a case." She related how in another case (in the territorial courts) she was not allowed to put in evidence of a hearsay nature to exonerate a criminal defendant she was representing,[5] but in

---

[5] The case was *Application of Palakiko and Majors*, 39 Haw. 167, aff'd *sub nom. Palakiko* v. *Harper*, 209 F. 2d 75. The case was a habeas corpus application, in which petitioner sought to put in evidence the statement of a woman that a police officer had said that he had beaten a confession out of petitioner's client. The Territorial Supreme Court held a lengthy evidentiary hearing on the petition, which covered many other matters, and at it excluded

the present case "a federal judge sitting on a federal bench permits Crouch [a witness] to testify about 27 years ago, what was said then . . . here they permit a witness to tell what was said when a defendant was five years old." She then declared, "There's no fair trial in the case. They just make up the rules as they go along." She gave the example of the New York Smith Act trial before Judge Medina, see *Dennis* v. *United States,* 341 U. S. 494, where she claimed "The Government can't make a case if it tells just what they did so they widened the rules and tell what other people did years ago, including everything including the kitchen sink." She declared, "Unless we stop the Smith trial in its tracks here there will be a new crime. People will be charged with knowing what is included in books—ideas." Petitioner said in conclusion that if things went on the freedom to read and freedom of thought and action would be subverted. She urged her auditors to go out and explain what a vicious thing the Smith Act was.

The specific utterances in the speech that the Legal Ethics Committee and the Supreme Court found as furnishing the basis for the findings that petitioner impugned Judge Wiig's integrity were the references (which we have quoted in full above) to "horrible and shocking" things at the trial; the impossibility of a fair trial; the necessity, if the Government's case were to be proved, of scrapping the rules of evidence; and the creation of new crimes unless the trial were stopped at once. We examine these points in particular, though of course we must do so in the context of the whole speech. In so doing we accept as obviously correct the ruling of the courts below that petitioner's remarks were not a mere generalized dis-

---

the evidence in question. The court's opinion does not discuss the point, but it is mentioned in the Court of Appeals' opinion on affirmance. 209 F. 2d, at 102–103.

course on Smith Act prosecutions but included particular references to the case going on in Honolulu.

I. We start with the proposition that lawyers are free to criticize the state of the law. Many lawyers say that the rules of evidence relative to the admission of statements by those alleged to be co-conspirators are overbroad or otherwise unfair and unwise; [6] that there are dangers to defendants, of a sort against which trial judges cannot protect them, in the trial of numerous persons jointly for conspiracy; [7] and that a Smith Act trial is apt to become

---

[6] One of the classic statements of this point of view is Mr. Justice Jackson's concurring opinion in *Krulewitch* v. *United States,* 336 U. S. 440, 453: "But the order of proof of so sprawling a charge [as conspiracy] is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of the existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction."

[7] "The unavailing protest of courts against the growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself, or in addition thereto, suggests that loose practice as to this offense constitutes a serious threat to fairness in our administration of justice. . . .

"The interchangeable use of conspiracy doctrine in civil as well as penal proceedings opens it to the danger, absent in the case of many crimes, that a court having in mind only the civil sanctions will approve lax practices which later are imported into criminal proceedings. . . .

"[T]he order of proof of so sprawling a charge is difficult for a judge to control. . . .

"There are many practical difficulties in defending against a charge of conspiracy which I will not enumerate. . . .

"[A survey conducted] which accords with our observation, will hardly convince one that a trial of this kind is the highest exemplifi-

632

a trial of ideas.[8]   Others disagree.   But all are free to express their views on these matters, and no one would say that this sort of criticism constituted an improper attack on the judges who enforced such rules and who presided at the trials.   This is so, even though the existence of questionable rules of law might be said in a sense to produce unfair trials.[9]   Such criticism simply cannot be equated with an attack on the motivation or the integrity or the competence of the judges.   And surely permissible criticism may as well be made to a lay audience as to a professional; oftentimes the law is modified through popular criticism; [10] Bentham's strictures on the state of the common law and Dickens' novels come to mind.[11]   And needless to say, a lawyer may criticize the law-enforcement agencies of the Government, and the prosecution, even to the extent of suggesting wrongdoing on their part, without by that token impugning the judiciary.   Simply to charge, for example, the prosecution with the knowing use of perjured testimony in a case is

cation of the working of the judicial process." Jackson, J., concurring in *Krulewitch* v. *United States*, 336 U. S. 440, 445–446, 451–452, 453, 454.

[8] This idea has been expressed in this Court also. See the dissenting opinion of MR. JUSTICE DOUGLAS in *Dennis* v. *United States*, 341 U. S. 494, 581, 583, and the separate opinion of MR. JUSTICE BLACK in *Yates* v. *United States*, 354 U. S. 298, 343–344.

[9] "[L]oose practice as to this offense [conspiracy] constitutes a serious threat to fairness in our administration of justice." Jackson, J., concurring in *Krulewitch* v. *United States*, 336 U. S. 440, 446.

[10] "England has just completed a century of struggle for procedural reform, and it is to the energy and determination of the public, and not to the leadership of the bar, that the credit for the pres ; English practice is. due." Sunderland, The English Struggle for Procedural Reform, 39 Harv. L. Rev. 725, 727 (1926).

[11] Both were at the bar. Bentham was of Lincoln's Inn and Dickens of the Middle Temple.

not to imply in the slightest any complicity by the judge in such actions. To charge that the Government makes overmuch use of the conspiracy form of criminal prosecution, and this to bolster weak cases, is not to suggest any unseemly complicity by the judiciary in the practice.[12]

In large part, if not entirely, Matsuoka's notes of petitioner's speech do not reveal her as doing more than this. She dwelt extensively on the nature of Smith Act trials and on conspiracy prosecutions. The Honolulu trial, to be sure, was the setting for her remarks, but they do not indicate more than that she referred to it as a typical, present example of the evils thought to be attendant on such trials. The specific statements found censurable (without which the bringing of the charge would have been inconceivable) are not in the least inconsistent with this, even though they must be taken to relate to the trial in progress. These specific statements are hardly damning by themselves, and clearly call for the light examination in context may give them; so examined, they do not furnish any basis for a finding of professional misconduct. She said that there were "horrible" and "shocking" things going on at the trial, but this remark, introductory to the speech, of course was in the context of what she further said about conspiracy prosecutions, Smith Act trials, and the prosecution's conduct. Petitioner's statement that a fair trial was impossible in context obviously related to the state of law and to the conduct of the prosecution and the FBI, not to anything that Judge Wiig personally was doing or failing to do. It occurred immediately after an account of the FBI's alleged pressuring of witnesses. The same seems clearly the case with the remark about the necessity of scrapping

---

[12] "[I]t is for prosecutors rather than courts to determine when to use a scatter-gun to bring down the defendant . . . ." Jackson, J., concurring in *Krulewitch* v. *United States*, 336 U. S. 440, 452.

the rules of evidence.[13]   The statement that if the trial
went on to a conviction, new crimes—those of thought or
ideas—would be created[14] could hardly be thought to
reflect on the trial judge's integrity no matter how di-
vorced from context it be considered.   How any of this
reflected on Judge Wiig, except insofar as he might be
thought to lose stature because he was a judge in a legal
system said to be full of imperfections, is not shown.   To
say that "the law is a ass, a idiot" is not to impugn the
character of those who must administer it.   To say that
prosecutors are corrupt is not to impugn the character of
judges who might be unaware of it, or be able to find no
method under the law of restraining them.   Judge Wiig
was not by name mentioned in the speech, and there was
virtually none of petitioner's complaints that was phrased
in terms of what "the judge" was doing.   For aught that
appears from petitioner's speech, Judge Wiig might have
been totally out of sympathy, as a personal matter, with
the Smith Act, the practice of trying criminal offenses on a
conspiracy basis, and the rules of evidence in conspiracy
trials, but felt bound to apply the law as laid down by
higher courts.[15]

---

[13] Again cf. Jackson, J., concurring in *Krulewitch* v. *United States,*
336 U. S. 440, 453–454: "The hazard from loose application of rules
of evidence is aggravated where the Government institutes mass
trials."

[14] In *Yates* v. *United States,* 354 U. S. 298, 318, this Court said:
"We are thus faced with the question whether the Smith Act pro-
hibits advocacy and teaching of forcible overthrow as an abstract
principle, divorced from any effort to instigate action to that end,
so long as such advocacy or teaching is engaged in with evil intent.
We hold that it does not."

The convictions of petitioner's Smith Act trial clients were all
reversed in the Court of Appeals on the authority of *Yates,* and
judgment ordered entered for them. *Fujimoto* v. *United States,* 251
F. 2d 342.

[15] Lower federal court judges have in the past questioned con-
spiracy indictment practice.   See the statement of the 1925 Con-

Even if some passages can be found which go so far as to imply that Judge Wiig was taking an erroneous view of the law—perhaps the comparison made between the case in the Territorial Courts where a hearsay statement was excluded and the admission of evidence in the Smith Act case might be of this nature, and much is made of it here though the Committee and the courts below made nothing of it—we think there was still nothing in the speech warranting the findings. If Judge Wiig was said to be wrong on his law, it is no matter; appellate courts and law reviews say that of judges daily, and it imputes no disgrace. Dissenting opinions in our reports are apt to make petitioner's speech look like tame stuff indeed. Petitioner did not say Judge Wiig was corrupt or venal or stupid or incompetent. The public attribution of honest error to the judiciary is no cause for professional discipline in this country. See *In re Ades,* 6 F. Supp. 467, 481. It may be said that some of the audience would infer improper collusion with the prosecution from a charge of error prejudicing the defense. Some lay persons may not be able to imagine legal error without venality or collusion, but it will not do to set our standards by their reactions. We can indulge in no involved speculation as to petitioner's guilt by reason of the imaginations of others.

But it is said that while it may be proper for an attorney to say the law is unfair or that judges are in error as a general matter, it is wrong for counsel of record to say so during a pending case. The verbalization is that it is impermissible to litigate by day and castigate by night. See 260 F. 2d, at 202. This line seems central to the Bar Association's argument, as it appears to have been to the

---

ference of Senior Circuit Judges, as quoted in Annual Report of the Attorney General, 1925, pp. 5–6; L. Hand, J., in *United States* v. *Falcone,* 109 F. 2d 579, 581.

reasoning of the court below,[16] and the dissent here is much informed by it, but to us it seems totally to ignore the charges made and the findings. The findings were that petitioner impugned the integrity of Judge Wiig and made an improper attack on his administration of justice in the Honolulu trial. A lawyer does not acquire any license to do these things by not being presently engaged in a case. They are equally serious whether he currently is engaged in litigation before the judge or not. We can conceive no ground whereby the pendency of litigation might be thought to make an attorney's out-of-court remarks more censurable, other than that they might tend to obstruct the administration of justice. Remarks made during the course of a trial might tend to such obstruction where remarks made afterwards would not. But this distinction is foreign to this case, because the charges and findings in no way turn on an allegation of obstruction of justice, or of an attempt to obstruct justice, in a pending case. To the charges made and found, it is irrelevant whether the Smith Act case was still pending. Judge Wiig remained equally protected from statements impugning him, and petitioner remained equally free to make critical statements that did not cross that line. We find that hers cannot be said to have done so. Accordingly, the suspension order, based on the charge relating to the speech, cannot stand.

II. Petitioner was also charged by the Committee, and found by the Supreme Court, to have misconducted herself by interviewing a juror shortly after the completion

---

[16] For example, the petitioner argued in the Court of Appeals that a law professor at Yale had made criticisms in more pungent terms than hers. Said the court: "We would uphold Professor Rodell's right to say from his Yale vantage point just about what he wants to say. But when he speaks he is not simultaneously harassing the very court in which he is trying an unfinished case." 260 F. 2d, at 200.

of the Smith Act trial. The juror had become mentally unsettled, in an obvious fashion, very shortly after the rendition of the verdict and apparently as a result of his participation on the jury. It was at this point that petitioner, having been first requested by his sister, several times interviewed him, and spoke with members of his family. The Supreme Court recognized that it had been common practice for attorneys in the Territory to interrogate jurors after the rendition of their verdicts and their discharges. Nevertheless, it found her action professional misconduct. The versions of the witnesses as to exactly what transpired at the interviews varied considerably, but the court made no findings of fact on the matter, and it is difficult to grasp the basis on which it singled petitioner's juror interviews out for censure against the pattern of a common practice of such interviews in the Territory.[17] While there is clearly some delicacy involved in approaching a juror who has become mentally unsettled, evidence that a juror was incompetent at the time of the rendition of the verdict might be admissible to impeach a verdict where evidence of the jury's mental and reasoning processes is not. While the inter-

---

[17] The court said: "It appears from the transcript which we have examined pursuant to the pretrial order herein, that her first visit to said David Fuller [the juror] was made by the respondent licensee upon request by his sister. It also appears that it has not been uncommon, if not in fact common practice, heretofore and within the Territory of Hawaii, for attorneys as well as others to interrogate jurors, after rendition of verdict by them, as to what may have been decisive in reaching a verdict.

"However, even if she relied upon the request of his sister when she first visited David Fuller, and upon a belief that it was common practice, locally, to interrogate trial jurors after verdict, such reliance thereon is not acceptable as excuse for her repeated visits to and studied interrogation of Fuller under the circumstances and as set forth in her affidavit, incorporated in the bill of particulars. . . ." 41 Haw., at 423–424.

views were undertaken under unusual circumstances, it is difficult to say whether the circumstances furnish more or less justification than is present in the average juror interview—which we do not read the Supreme Court's opinion as holding censurable, except as to the future.[18] The Legal Ethics Committee had charged petitioner with concealment of facts in her affidavit as to the juror interview filed with Judge Wiig in support of her motion for a new trial for the Smith Act defendants, but we do not find anything in the Supreme Court's opinion agreeing with these charges.

But we need not explore further what the basis was for the Territorial Supreme Court's finding on this charge. As to it, the court said that the suspension order it rendered on the charge relating to the speech would suffice.[19] The Court of Appeals was of opinion that if the charge as to the speech were insupportable, in the present posture of the case the suspension could not stand, 260 F. 2d, at 202, and we agree. We cannot read the Supreme Court's opinion as imposing any penalty solely by reason of the interview with the juror. Accordingly, we do not believe it would be appropriate in the posture of the case for us finally to adjudicate the validity of the finding of misconduct by reason of the interviews.

III. The Court of Appeals expressed doubt as to its jurisdiction to hear the appeal from the Territorial Supreme Court, and respondent here urges that that court

---

[18] The court-gave a warning to the future conduct of the Bar that interrogation of jurors as to occurrences in the jury room and as to the reasons why the jury reached its verdict would be at the peril of the interrogator. 41 Haw., at 425.

[19] "However, in the instant matter, this court will let its hereinbefore expressed disciplinary order—suspending the said respondent licensee from the practice of law in the territorial courts for one year and requiring her to pay costs—suffice, although also deeming gross misconduct her said repeated interviews with and interrogations of David Fuller." *Ibid.*

was without jurisdiction. Since our jurisdiction to hear the case on the merits must stand or fall with that of the Court of Appeals, we examine the objections. They are without merit. The Court of Appeals for the Ninth Circuit has jurisdiction of appeals from final judgments of the Supreme Court of the Territory of Hawaii, pursuant to 28 U. S. C. § 1293, in "civil cases where the value in controversy exceeds $5,000, exclusive of interest and costs." [20] The suspension order would have the effect of removing petitioner from the practice of law for at least one year, and she filed an uncontroverted affidavit that her annual net income from the practice of law had been for years, and would continue foreseeably, in excess of $5,000.[21] It is insisted that petitioner's right cannot be reduced to monetary terms, because it is "priceless," and so it is, in a manner of speaking; but besides the professional aspects of her status, her continuance in a specific form of gainful employment is in issue, see *Bradley* v. *Fisher,* 13 Wall. 335, 355, and hence the jurisdictional amount was present.

Finally, we find no inhibition as to the scope of review we have given the judgment of the Territorial Court. The Territorial Court is one created under the sovereignty of the National Government, *O'Donoghue* v. *United States,* 289 U. S. 516, 535, and hence this Court (once the

---

[20] "The courts of appeals for the First and Ninth Circuits shall have jurisdiction of appeals from all final decisions of the supreme courts of Puerto Rico and Hawaii, respectively in all cases involving the Constitution, laws or treaties of the United States or any authority exercised thereunder, in all habeas corpus proceedings, and in all other civil cases where the value in controversy exceeds $5,000, exclusive of interest and costs." 28 U. S. C. § 1293.

[21] "Where the power of any court of appeals to review a case depends on the amount or value in controversy, such amount or value, if not otherwise satisfactorily disclosed upon the record, may be shown and ascertained by the oath of a party to the case or by other competent evidence." 28 U. S. C. § 2108.

jurisdictional Act is satisfied) is not limited as it would be in reviewing the judgment of the highest court of a State. Of course this Court and the Courts of Appeals must give the Territorial Courts freedom in developing principles of local law, and in interpreting local legislation. See *Bonet* v. *Texas Co.*, 308 U. S. 463; *DeCastro* v. *Board of Commissioners*, 322 U. S. 451, 454–458. But it hardly needs elaboration to make it clear that the question of the total insufficiency of the evidence to sustain a serious charge of professional misconduct, against a backdrop of the claimed constitutional rights of an attorney to speak as freely as another citizen, is not one which can be subsumed under the headings of local practice, customs or law.

*Reversed.*

[For concurring opinion of MR. JUSTICE BLACK, see *post,* p. 646.]

[For opinion of MR. JUSTICE STEWART, concurring in the result, see *post,* p. 646.]

[For dissenting opinion of MR. JUSTICE FRANKFURTER, joined by MR. JUSTICE CLARK, MR. JUSTICE HARLAN and MR. JUSTICE WHITTAKER, see *post,* p. 647.]

[For dissenting opinion of MR. JUSTICE CLARK, see *post,* p. 669.]

## APPENDIX TO OPINION OF MR. JUSTICE BRENNAN.

THE EXPANDED NOTES OF THE REPORTER, MATSUOKA, RELA-
TIVE TO PETITIONER'S SPEECH.

"She followed Samuel M. Bento, who said he wanted to say good morning to the Tribune-Herald, pointing generally toward the paper's reporter from Hilo and the

paper's Honokaa correspondent who were sitting side by side.  Mrs. Sawyer preceded Jack W. Hall.  She began speaking at 11 a. m. and ended 11:30 a. m.

---

"Notes on what she said in the order of how she proceeded: The trial is really a trial of Jack Hall to which has been added six others.  It's to get at the ILWU.
"Said she wanted to tell about some rather shocking and horrible things that go on at the trial.

---

"She was appointed some years ago (3 or 4 years ago) by a court to defend a man who had no money to hire his own counsel.  He was charged with pimping and procuring. The complaining witness in the case was a woman who had been in business 20 years in the territory who claimed she had reformed and repented but this vicious man had driven her back again into the business.  It turned out that the hotel where he had kept her had 27 doors unlocked.  Likened this to pukas in the Smith act.

---

"Said men in power are trying to put men in jail because of their thoughts.  and books written before he was born.
    "One of the reasons Jack Hall is on trial is because it is said he once got a book, the Communist Manifesto, written in 1898, before Jack Hall was a gleam in his father's eye.
    "She quoted from manifesto: a spectre is haunting Europe;  the spectre is communism.  she explained spectre means ghost.  said spectre still seems to be haunting people today.
    "She turned next to conspiracy.  noted there was a conspiracy trial in 1937 of filipino brothers.  conspiracy to advocate violence and criminal sindicalism.  explained conspiracy means agreement.  government never has

used conspiracy when it had a case. when it hasn't got enough evidence it lumps a number together and says they agreed to do something. the government does not say . . advocated overthrow but says they agreed to. conspiracy means to charge a lot of people for agreeing to do something you have never done.

---

"touched on myth of agents of fbi. they're supposed to be extra special. radio programs, movies, publicity tell how wonderful they are. but when you see hundreds of tax fraud cases go by and when they spend most of their time investigating people's minds it's time to cut them down to size. said she had told this to a honolulu gathering. labor day? fbi agents should be called federal cops. said has slogan: put away your thoughts here come the federal cops. cops push people around.

---

"paul crouch. difficult to understand why he's witness. but he was here in 1924; because he was once in Hawaii, so guess that's why. he testified what he did in russia in 1927. he told what he was told by generals etc. usually you cannot testify on what people told you when there is no chance for those to be cross examined. aileen fujimoto was four years old then. what has crouch's galloping over the plains of russia got any bearing on her. jack hall was 13. but the government goes on with testimony for two weeks on what crouch did between 1927 and 1941 without ever mentioning the defendants. "he told of/infiltration of the armed forces and plots . . . it used to be the idea that a man is responsible for what he did and said—not what someone else did. not a single one of the defendants was of age at the time he's talking about. the jury is not going to pay attention to what

Crouch says. but it's the old smear. The prosecution says crouch did this and that and we (prosecution) say the defendants are communist party members so they must have done the same.

"but government propaganda has been going on for 10 years before the jurors went into the jury box.

---

"it's enough to say a person is a communist to cook his goose. the government says there was an agreement to violate the smith act which was passed in 1940. then the defendants agreed to violate it before it was passed. crouch said he was at a communist meeting in 1941 and saw five or six people there. it was the first time he'd seen them. but he was satisfied when he came to honolulu 12 years later that one was Koji Ariyoshi. she urged audience try to recall what they did 12 years ago. said she can't recall details. god knows no one has a memory that good. yet they use this kind of testimony.

---

"why? because they will do anything and everything necessary to convict.

"some of the witnesses testified differently from what they testified previously. the government knows this but deliberately goes ahead and have him say things in order to convict. mentioned izuka in reinecke trial testimony. said something about izuka saying he didn't know the party advocated overthrow of government until he got out of party.

"witnesses testify what government tells them to. just as they read portions of books like overthrow the government and leave out the rest which says czarist government showing it dealt with russia.

"johnson testimony. said he came back from san francisco with communist books and literature in a duffle bag. he said when he got to Honolulu he told Jack Hall the names of some of the books. then the government for two days reads from books supposed to have been in the duffel bag. they're not dealing with what jack hall said. on cross examination johnson said he did not tell the names of the books but just showed jack hall the duffel bag. so jack hall violated the smith act because he saw a duffel bag with some books on overthrowing the government in it. it's silly. why does the government use your money and mine to put people in jail for thoughts

---

"the government has carried on a barrage of propaganda for many years and expects people in the jury to have hysteria just hearing about communist is enough to jail. said has a friend who worked for sears roebuck and has family of three children and wife. he made a terrible mistake one time. in 1941 he lived in the same house as jack hall. the fbi wanted him to testify. he said i feel jack hall is one of the finest people i have known. apparently the fbi didn't like this. so they suggested to sears and roebuck to fire him because he wouldn't cooperate with the government.

---

"he wasn't fired so they went to the Los Angeles and Chicago offices of sears and roebuck and convinced them he had to be fired. he was fired because he refused to be a stool pigeon and informer. the government gets away with it by making people fear that if they don't do as it wants they'll be branded red and lose their jobs.

, "there's no such thing as a fair trial in a smith act case. all rules of evidence have to be scrapped or the government can't make a case.

"referred to her habeas corpus move in the palakiko—
majors case.

---

"said a woman came to her with report she heard vernon
stevens say he bet a confession out of one of them. she
testified but the supreme court refused to let the evidence
in because vernon stevens was not here and had no
chance to deny this. with the same situation a federal
judge sitting on a federal bench permits crouch to testify
about 27 years ago. what was said then. in the previous
case it was the life and death of one. and yet here they
permit a witness to tell what was said when a defendant
was five years old.

---

"there's no fair trial in the case. they just make up
the rules as they go along. the first smith act case was in
1949 of the new york top leaders. attorneys contended
they should have the right to say what they did from
1924. medina permitted them to say what the defend-
ants themselves did from 1934 on. but the government
can't make a case if it tells just what they did so they
widened the rules and tell what other people did years
ago, including everything including the kitchen sink.
  "unless we stop the smith trial in its tracks here there
will be a new crime. people will be charged with knowing
what is included in books. ideas.

---

"mentioned los angeles trial in which someone said there
was no evidence that someone had instructed persons not
to read some books.
"said there'll come a time when the only thing to do is to
keep your children from learning how to read. then not

only will unions be destroyed by [*sic*] so will freedom of thoughts and action. there'll be dark ages of thought control when people won't be able to speak freely in taverns and other places.

"she urged audience to go out and explain what a vicious thing the smith act is. people are tried for books written years ago."

---

Mr. Justice Black, concurring.

Assuming that there is a specific law of some kind in Hawaii which purports to authorize petitioner's suspension or disbarment upon the charges against her, I agree with Mr. Justice Brennan, for the reasons he gives, that the charges were not proved. My agreement is not to be considered however as indicating a belief that Hawaii has such a law, that it would be valid if it existed, or that petitioner was given the kind of trial which federal courts must constitutionally afford before imposing such a drastic punishment as was inflicted on petitioner.

Mr. Justice Stewart, concurring in the result.

If, as suggested by my Brother Frankfurter, there runs through the principal opinion an intimation that a lawyer can invoke the constitutional right of free speech to immunize himself from even-handed discipline for proven unethical conduct, it is an intimation in which I do not join. A lawyer belongs to a profession with inherited standards of propriety and honor, which experience has shown necessary in a calling dedicated to the accomplishment of justice. He who would follow that calling must conform to those standards.

Obedience to ethical precepts may require abstention from what in other circumstances might be constitution-

ally protected speech. For example, I doubt that a physician who broadcast the confidential disclosures of his patients could rely on the constitutional right of free speech to protect him from professional discipline.

In the present case, if it had been charged or if it had been found that the petitioner attempted to obstruct or prejudice the due administration of justice by interfering with a fair trial, this would be the kind of a case to which the language of the dissenting opinion seems largely directed.* But that was not the charge here, and it is not the ground upon which the petitioner has been disciplined. Because I agree with the conclusion that there is not enough in this record to support the charge and the findings growing out of the petitioner's speech in Honokaa, I concur in the Court's judgment.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE CLARK, MR. JUSTICE HARLAN and MR. JUSTICE WHITTAKER join, dissenting.

Petitioner was suspended from the practice of law in the Territory of Hawaii for one year. The charges on which the suspension order was based related (1) to a speech made by petitioner at Honokaa, Hawaii, while a criminal trial was in progress, in Honolulu, in which she

---

*See Canon 20 of the Canons of Professional Ethics of the American Bar Association. "Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally they are to be condemned. If the extreme circumstances of a particular case justify a statement to the public, it is unprofessional to make it anonymously. An *ex parte* reference to the facts should not go beyond quotation from the records and papers on file in the court; but even in extreme cases it is better to avoid any *ex parte* statement." Canons of Professional and Judicial Ethics, American Bar Association, 1957.

was attorney of record and an active lawyer for the defense, and (2) to petitioner's interview of a juror, after the trial had terminated in a verdict of guilty. The judge presiding at the trial requested the Bar Association to investigate Mrs. Sawyer's conduct. Following investigation, charges and a recommendation of disciplinary action were filed with the Hawaii Supreme Court which referred the matter to its Legal Ethics Committee. Following a full hearing the Committee, in the main, agreed with the charges of the Bar Association and submitted its conclusion to the Hawaii Supreme Court which made a *de novo* examination of the record, resulting in the order now before us. The suspension order was based upon the Honokaa speech, although the Hawaii Supreme Court also found that the interview of the juror, in view of the circumstances under which it was made, constituted professional misconduct. The Court today finds the conclusions of the Hawaii Supreme Court, on which the suspension order is based, wanting in a reasonable foundation and directs the Hawaii court to readmit Mrs. Sawyer to the practice of law. Since this Court finds that the suspension order was grounded on the speech, it leaves unreviewed the finding of professional misconduct growing out of the juror interview. When the case goes back to Hawaii, the Hawaii Supreme Court is apparently free to take further disciplinary action. Putting to one side the charge of misconduct relating to the interview of the juror, I think the judgment below should stand since the suspension based on the misconduct relating to the Honokaa speech is fully supported by the record.

"We think," says the opinion of MR. JUSTICE BRENNAN, "that our review may be limited to the narrow question whether the facts adduced are capable of supporting the findings that the petitioner's speech impugned Judge

Wiig's impartiality and fairness in conducting the Smith Act trial and thus reflected upon his integrity in the dispensation of justice in that case." The limited reach of this question is illumined by the limited use made of the evidence in the record in MR. JUSTICE BRENNAN's opinion. If the record contained no more than the portions of it that are drawn upon in MR. JUSTICE BRENNAN's opinion, one would be led to conclude that the sole question in the case was whether the verbal content of the petitioner's speech, in disregard of all else, supported the findings of the Hawaii Supreme Court on which petitioner's suspension was based. Such is not the issue that the record as an entirety presents. In the law as elsewhere the answer to a problem largely depends on the way the question it presents is put. A wrong question is not likely to beget a right answer.

Brother BRENNAN's formulation of the problem before us and the resulting restriction on its use of the record, misconceive the findings upon which petitioner's suspension was based and neglect important aspects of the relevant evidence. As a result, the Court seriously impairs the responsibility of the bar and, more particularly, of criminal lawyers engaged in the conduct of trials, by encouraging cases to be tried on the hustings and in the press, instead of within a court-room and subject to its constitutionally circumscribed safeguards.

Since the case must be seen in its true scope and perspective, it is important to state in full the findings of the Hawaii Supreme Court relevant to the speech:

> "It is the finding and conclusion of this court that the allegations contained in the complaint of the Bar Association of Hawaii, more particularly paragraphs 'I,' 'II,' and 'III' thereof . . . have been sustained by convincing proof, by credible evidence of more than a mere preponderance; that the said respondent

licensee, a member of the Bar of this court and an attorney at law, duly licensed and admitted to practice before all of the courts of the Territory of Hawaii . . . did, as charged in said paragraph II, being then an attorney of record for a defendant in a then pending case in the United States District Court for the District of Hawaii . . . during the course of trial of said case, to wit, on or about December 14, 1952, say during a speech to a public gathering in Honokaa, Hawaii, that horrible and shocking things were going on at said trial; that a fair trial was impossible; that all of the rules of evidence were being scrapped so the government could make its case; that the rules of evidence and procedure were made up as the case proceeded; and that unless the trial was stopped in its tracks certain new crimes would be created. . . .

"Upon its finding and conclusion as stated *supra,* this court deems that in saying what she did in her speech to a public gathering at Honokaa, Hawaii, on December 14, 1952 . . . when there was then pending . . . a case under the Smith Act . . . she engaged and participated in a willful oral attack upon the administration of justice in and by the said United States District Court for the District of Hawaii and by direct statement and implication impugned the integrity of the judge presiding therein and in the said pending case . . . and thus tended to also create disrespect for the courts of justice and judicial officers generally, contra to the obligations and duties assumed, as incident to the license, by her and by every person to whom a license has or shall have been issued by this court to practice in the courts of the Territory of Hawaii. She has thus committed what this court considers gross misconduct." 41 Haw. 403, at 421–423.

These conclusions, which essentially adopted the charges and conclusions of the Legal Ethics Committee,[1] rested on a *de novo* examination of the record of a full hearing before the Legal Ethics Committee, "unprejudiced" by the findings of that Committee or of the Bar Association. A majority of the Court of Appeals agreed

---

[1] After the Bar Association had filed a complaint against Mrs. Sawyer, a complaint that was essentially in terms of findings of fact as to what she had said at Honokaa, a full investigation was made by the Legal Ethics Committee. This Committee then reported its findings of fact, conclusions and charges to the Hawaii Supreme Court which heard argument and made a *de novo* examination of the record. It is clear that these charges fully encompassed the basis for the Hawaii Supreme Court's own findings and that Mrs. Sawyer was fully and fairly apprised of the charges against her and the factual matters that were in dispute.

The Report of the Legal Ethics Committee, insofar as it was relevant to the speech, charged as follows:

"The Legal Ethics Committee . . . has investigated a complaint filed by the Bar Association of Hawaii and makes this report of the charges, facts and conclusions of the Committee pursuant to Rule 19.

"The Charges:

"The two charges made in this complaint have to do with (1) the alleged improper conduct of Mrs. Harriet Bouslog Sawyer, referred to in this report as 'Mrs. Bouslog,' in making a speech at Honokaa, Hawaii, on December 14, 1952, and (2) the alleged improper conduct in connection with her interview of the juror David P. Fuller, as more fully set forth in the Bill of Particulars dated September 29, 1954.

"The Facts:

"The Committee finds that Mrs. Bouslog was one of the attorneys appearing for certain defendants in the United States District Court for the District of Hawaii entitled 'United States of America, Plaintiff, against Charles Kazuyuki Fujimoto, et als., Defendants,' being Criminal 10495 in that Court; that on December 14, 1952, during the course of the trial, she made a speech at a public gathering at Honokaa, at which she said, among other things, that horrible and shocking things were going on at the trial; that there was no fair

that the record supported the conclusions.   260 F. 2d 189. Of course we are not a court of first instance in reviewing these findings.   We are not empowered to set aside the conclusions of the Supreme Court of Hawaii, affirmed by the Court of Appeals, if its conclusions find reasonable support—that is, if conscientious judges could not unreasonably have reached such a conclusion on the strength of the evidence disclosed by the record and the inferences fairly to be, drawn from it.

Thus, the real issue before us is whether evidence supports the conclusion that Mrs. Sawyer in her speech, in the full setting and implications of what she said, engaged in a willful attack on the administration of justice in the particular trial in which she was then actively participating, and patently impugned, even if by clear implication rather than by blatant words, the integrity of the presiding judge, and thereby violated the obligations of one in her immediate situation, judged by conventional professional standards, so as to be reasonably deemed to have committed what the Hawaii Supreme Court termed "misconduct."

One of the elements of the misconduct found by the Hawaii Supreme Court and the Court of Appeals was, without doubt, the attack on the integrity of the judge

---

trial in the case; that they just made up the rules as they went along; that unless the Smith Act trial was stopped in its tracks in Honolulu there would be a new crime.

"Conclusions and Recommendations:

"The Committee is of the unanimous opinion that the Bar Association of Hawaii has sustained the allegations in paragraphs II and III of its complaint and that Mrs. Bouslog, in imputing to the Judge unfairness in the conduct of the trial, in impugning the integrity of the local Federal courts and in other comments made at Honokaa, was guilty of violation of Canons 1 and 22 of the Canons of Professional Ethics of the American Bar Association and should be disciplined for the same."

presiding at the trial in which she was engaged. Surely that does not mean she must have referred to Judge Wiig by name. Nor does it mean, as the opinion of MR. JUSTICE BRENNAN seems to assume, that any evidence which does not consist of a direct attack on the judge is irrelevant to the ultimate question: could the Hawaii Supreme Court have found petitioner guilty of misconduct as set forth in its opinion?

By carefully isolating various portions of the Matsuoka notes,[2] concentrating on them as a self-contained, insulated document, the opinion of MR. JUSTICE BRENNAN labors to put a neutral, if indeed not an innocently attractive, patina on Mrs. Sawyer's remarks. But the speech must be interpreted in its entirety, not distorted as an exercise in disjointed parsing. It must be placed in its context of time and circumstances. Nor can we neglect the fact that what people say is what others reasonably hear and are meant to hear. When this is done what emerges is no abstract attack on the state of the law, no analysis of the dubieties of Smith Act trials with which even judges may agree or, at all events, which critics have an unquestioned right to make, no Dickensian strictures on the injustices of legal proceedings, but a plainly conveyed attack on the conduct of a particular trial, presided over by a particular judge, involving particular defendants in whose defense Mrs. Sawyer herself was professionally engaged. There is ample support for the reasonable conclusion that, in making the fairness of the conduct of this particular trial the target of her appeal to a crowd outside while the trial was proceeding inside the court-room, Mrs. Sawyer was including in her assault the judicial officer who both in fact and in common understanding bears ultimate responsibility for the fairness and evenhandedness of judicial proceedings—the

---

[2] The Matsuoka notes are reprinted at 260 F. 2d 205–207.

presiding judge. In examining this record sight must never be lost of the limited scope of our reviewing power. We are only concerned with whether the findings have fair support in the record. If the findings are so supported we have the right to strike down the suspension only if it transgresses constitutional limits. We must indeed have in mind, as the opinion of MR. JUSTICE BRENNAN reminds us, the entire "context" of this speech. We must endeavor to understand the complete utterance in its setting, as it sounded and was meant to sound to its auditors in Honokaa, Hawaii, on December 14, 1952.

The Honokaa meeting was sponsored by a committee for the defense of Jack Hall, one of the principal defendants in the Smith Act trial then under way in Honolulu,[3] in which Mrs. Sawyer was one of the group of lawyers for the defense. It was publicly announced and advertised that the topic of the meeting would be the Smith Act trial in Honolulu. The general public was invited and members of the press were present, as well they might be expected to be at a meeting where among the principal speakers were a defendant and a defense attorney in a highly controversial trial. It was controversial, not an obscure, run-of-the-mill trial; it had been receiving front-page publicity in the Hawaii press for weeks.[4] The defendant Hall himself was one of the principal speakers and Mrs. Sawyer was on the platform. Her function was, as stated by Mr. Hall, "to explain the legal aspects of the prosecution." Certainly this setting precludes a naive

---

[3] See *Fujimoto* v. *United States*, 251 F. 2d 342.

[4] See, *e. g.*, the Honolulu Star Bulletin for the month of December. In fact, the same day on which Mrs. Sawyer's speech was reported, a banner, lead headline announced the latest court-room developments, while the story of the action taken by the court in response to the speech occupied the front page for the next few days. See the Honolulu Star Bulletin for Dec. 15, 1952, *et seq.*

conclusion that Mrs. Sawyer was delivering herself of
an abstract dissertation on Smith Act trials, using illus-
trations from the Honolulu trial merely as "typical present
examples" of the evils of such prosecutions. The envel-
oping environment of her talk, intensified by much other
evidence, gives substantial support to the conclusion that
Mrs. Sawyer was, in the main, discussing and attacking
the Honolulu trial and that her more general con-
demnations were directed toward, and designed to have
particular applicability to, that trial.

The fullest account of the speech is found in the notes
made by Matsuoka, a newspaperman covering the meet-
ing. These notes, though not themselves contempora-
neous, are a slightly expanded version of handwritten con-
temporaneous notes which Matsuoka took and used as
the basis for his news story of the meeting.[5] Matsuoka
testified that the notes were full and accurate and con-
tained "almost everything" of what Mrs. Sawyer said.
It is significant that more than half of the notes con-
tain comments directly and solely relating to the Hono-

---

[5] The nature of the expansion was explained in the following
colloquy between counsel and Matsuoka at the hearing before the
Legal Ethics Committee:

"Q. You stated that the transcription of these notes were somewhat
expanded from your original notes?

"A. Yes.

"Q. Would that also be true of the newspaper article?

"A. When I say expanded, I mean, like, when I take notes, I
would not say, 'Robert Dodge yesterday,' I would say, 'Dodge,' or
something like that, and expand that to make it understandable to
the reader.

"Q. By expanding, not adding to it?

"A. No, not adding to.

"Q. Or an addition, or anything of that kind, but filling out what
your notes indicated, is that it?

"A. That's right, by expanding on it."

lulu trial.[6] However, these notes were not the only evidence of the content of the speech. Several persons who had been in the audience at Honokaa testified before the Legal Ethics Committee, and their testimony was part of the record considered by the Hawaii Supreme Court. This testimony lends substantial support to the finding that the basic intent and purport of the speech was to attack the conduct of the trial in which Mrs. Sawyer had been engaged on the day she made her speech and would again be engaged the next morning.

Thus, Matsuoka testified that Mrs. Sawyer spoke about

"The Smith Act trial; that was under way in Honolulu. She said she wanted to tell the people about some of the shocking, horrible things that went on, and that the Smith Act trial could not be a fair one, and that they just had to go around and make rules to fit the situation. That was, I think, the general trend."

Another witness testified that

"She said that the trial was against Jack Hall, and six others were just brought in, and that its purpose was to get at the ILWU; she said that Jack Hall was being tried on something that he read many years ago, and she said that in the Smith Act trial there were no rules, and that they were making up the rules as they went along, and she said that the F. B. I. could be called Federal cops, and that when the government—they were stressing this case, and when

---

[6] It is fair to say that approximately 80 of the about 140 lines of the Matsuoka notes as reprinted in the record deal specifically with this particular trial and the evidence which was being introduced in Honolulu. Of course, as we have explained above, many of the more general comments could, in the context of this speech, be reasonably taken to refer to the Honolulu trial.

the government—that witnesses were afraid to testify, and they testified usually what the government wanted them to testify."

Here is another quotation from the testimony before the Hawaii court:

"Q. Will you tell the Committee what Mrs. Bouslog said?

"A. Well, that the defendant in the Smith Act trial cannot get a fair trial.

"Q. What Smith Act trial was she talking about?

"A. The one in Honolulu."

When to this evidence is added the setting we have described, and the fact that to those who read the Hawaii papers "the" Smith Act trial, was the notorious, much-exploited trial of the "Hawaii Seven," how can one reasonably escape, on the basis of the record which determines our adjudication, the conclusion that Mrs. Sawyer was directly castigating the administration of the very trial in which she was then professionally engaged? [7] So viewed the specific statements which she made lose the aura of innocence the Court has cast about them and support the finding that Mrs. Sawyer was guilty of professional misconduct in attacking the administration of justice in the Honolulu trial and impugning the integrity of its presiding judge.

Matsuoka's notes reveal that Mrs. Sawyer began her speech by announcing that the Honolulu trial was "to get at the ILWU [International Longshoremen's and Ware-

---

[7] Petitioner's lawyer had no doubt regarding the meaning and purport of the speech.

"I will say to the Committee right now—I have read these speeches and I would agree with the conclusion implicit in Mr. Dodge's question; namely that this was a talk about what was going on in the Smith Act trial here in Honolulu. Now, let's not fool ourselves about that. We're lawyers here."

housemen's Union]." She next said that "she wanted to tell about some rather shocking and horrible things that go on at the trial." The opinion of MR. JUSTICE BRENNAN views these remarks as merely "introductory" to her later "general" comments, neglecting the fact that most of her later comments were not general at all but related directly to the trial of Hall, and similarly neglecting the entire milieu in which the speech was delivered. The remarks were "introductory," but introductory in that they set the tone and temper of all that followed. There is ample testimony that her audience so understood the remarks. Their understanding was justified by what she said, and that they so reasonably understood what she said establishes the reasonableness of the conclusion that she intended them so to understand. This is the way the speech was remembered by one of her audience.

> "I think she gave a very excellent speech, and what I can remember quite well was that she said she would like to tell the audience of the horrible and shocking things that went on at the Smith Act trial in Honolulu, and she also gave several illustrations, but, I am sorry, I cannot remember them . . . ."

Another witness when asked if Mrs. Sawyer had said that there were shocking and horrible things going on, responded that those phrases had been specifically directed at the "Jack Hall trial." Again, after testifying that Mrs. Sawyer had said the trial at Honolulu was not a fair trial, still another witness went on to say that "she gave various examples of things, that I don't recall, that were going on, in what she called the horrifying, shocking trial."

That this theme of "horrifying and shocking" so forcefully impressed itself on the people to whom she spoke strips the words of any neutral interpretation, and certainly justifies, if it does not compel, the inference that it formed the motif for the entire speech.

This evidence establishes more than that Mrs. Sawyer was attacking the conduct of the Honolulu trial at large. It clearly reflects on the judge who was permitting or participating in these "shocking and horrible" things; at the lowest it allows the inference to be drawn, as the Hawaii Supreme Court did draw the inference, that she did so reflect. To suggest that the only reasonable inference we may draw from her speech is that petitioner was indicting the general state of the law or merely reflecting on the prosecution, is to deny the obvious fact that when a lawyer harangues a lay audience, wholly unskilled in drawing subtle distinctions for exculpatory purposes, about the horrible and shocking things going on in a judicial proceeding, he inevitably reflects upon the total conduct of that trial and upon the integrity of all, not excluding the judge, responsible for the conduct of the trial. Certainly if we, as lawyers, were addressed by a doctor on the theme of the horrible and shocking things that go on at X hospital, and the speaker dwelt on specific examples of conduct at that particular hospital, we would not assume that merely the general sad state of medicine was being impugned rather than the doctors and the administrators at that hospital.

Petitioner also declared in her speech that "there's no fair trial in the case. they just make up the rules as they go along." And again, "there's no such thing as a fair trial in a smith act case.. all rules of evidence have to be scrapped or the government can't make a case." By an evaporating reading these comments are made to say that they "obviously related to the state of the law, and to the conduct of the prosecution and the FBI . . . ." But the materials used to illustrate these charges were specific examples of the unconscionable use of evidence drawn from this particular trial, as the defendant Hall himself pointed out at the hearing before the Legal Ethics Committee. In fact, a large part of the speech was taken up

with such specific examples. To say that petitioner was attacking the "state of the law," or the "prosecution," or, what is more to the point, to suggest that this is the only conclusion the Hawaii court could reasonably draw, rejects the obvious force of the evidence that her references throughout were to the manner in which this particular trial was being conducted [8] and disregards, it cannot be too often emphasized, the whole tone, nature and setting of her speech.

To be sure, petitioner often did not specify who was guilty of the sins which she charged were being committed at this trial; the sins of unfairness, of ignoring or making up the rules, of doing "anything and everything necessary to convict." When such broadside attacks are made a court is not compelled to make the ingenuous assumption that they were directed only at those who are legitimately subject to such attack, when it is made by a trial lawyer in the midst of a case in a haranguing speech to a public gathering. It takes no master of psychology to know that if the speaker does not discriminate neither will the audience. Inevitably the accusation covers all those who in the common understanding have responsibility. Whatever secret reservations the speaker may have when he speaks does not infuse what he conveys. Even the most sophisticated audience is not so trained in withholding judgment that the heavy and repeated charges of unfairness in the conduct of this trial impliedly relieved the presiding judge, who bears basic responsibility

---

[8] Mrs. Sawyer herself, in explaining her remarks to the court, pointed out that part of her speech "was devoted to a discussion of the evidence on which the prosecution in this case is seeking to convict Jack Hall and the other six defendants in this case. . . ."

The record discloses that other witnesses also understood that her references were to the "rules being made up as they went along" at this particular trial.

for judicial proceedings, of all responsibility for this unfairness.

More than that, the attack on the judge presiding at the trial does not rest merely on implication. It was direct and clear. Again the remarks about unfairness and the rules that were "made up" must be read not in isolation but in context. After outlining several examples of what she considered to be the outrageous evidence being admitted in this case, petitioner made her remark that there was "no such thing as a fair trial in a smith act case. all rules of evidence have to be scrapped or the government can't make a case." Matsuoka's notes reveal that she then proceeded to illustrate this remark by relating that in an earlier case of hers, in which, the voluntariness of an accused's confession had been in issue, "a woman came to her with report she heard vernon stevens [Stevens was a police officer] say he bet [sic] a confession out of one of them. she testified but the supreme court [of Hawaii] refused to let the evidence in because vernon stevens was not here and had no chance to deny this. with the same situation a federal judge sitting on a federal bench permits crouch [9] to testify about 27 years ago. what was said then. in the previous case it was the life and death of one. and yet here they permit a witness to tell what was said when a defendant was five years old." This graphic illustration was followed by the remark that "there's no fair trial in the case. they just make up the rules as they go along." Crouch was a witness in the Honolulu trial whose testimony had been

[9] The fact that the notorious Crouch was involved is, of course, wholly irrelevant to the issues in this case. Any grievances arising out of Crouch's testimony were properly to be pursued in the orderly course of justice in trial and appellate courts and eventually here. See *Communist Party* v. *Subversive Activities Control Board*, 351 U. S. 115.

662

attacked earlier in the speech, and the "federal judge" was Judge Wiig who was presiding over that trial. This portion of the speech dispels any illusions that the condemnatory remarks made by petitioner could not reasonably be thought to relate to the conduct of this trial. In the context of the entire speech it is inescapably a direct reflection on the fairness and integrity of this particular judge in this particular case. This was no abstract assault on the rigors of hearsay. Petitioner attacked the fairness of the trial and the scrapping of the rules of evidence. She then pointed to a ruling of Judge Wiig which she said was highly prejudicial and hardly left doubt that it was made in this particular trial. She then repeated her charge that the trial was unfair and the rules made up. To suggest that the only reasonable inference to be drawn from these remarks is that the conduct of the prosecution or the law of evidence in the abstract was impugned, is really asking too much from judges, even if we accept Mr. Justice Holmes' view that judges "are apt to be naif, simple-minded men." Holmes, Collected Legal Papers, p. 295. The attacks on fairness and the misuse of rules are made vivid by the illustration used— and that illustration directly involved Judge Wiig.[10]

---

[10] Certainly Mrs. Sawyer's explanation of these remarks does not help us rationally to avoid Holmes' characterization. After a discussion of the refusal of the Hawaii Supreme Court to admit the evidence in the previous trial referred to by Mrs. Sawyer, petitioner was asked:

"Mr. Barlow: In other words, would it be fair to say that you paralleled that with the phrase that Mr. Matsuoka attributes to you: 'With the same situation, a Federal judge, sitting on a Federal Bench, permits Crouch to testify about 27 years ago what was said then'?

"The Witness: I used the Palakiko-Majors case as a contrast to Mr. Crouch's testimony and the hearsay testimony in the conspiracy case.

It is true that the charges which were found proven as the basis of the suspension did not state in terms that petitioner intended to obstruct justice. To reverse the two courts below on this ground is to resurrect the worst niceties of long-interred common-law pleading. The charges on the basis of which the petitioner was found guilty of misconduct are not to be read with "the inability of the seventeenth century common law to understand or accept a pleading that did not exclude every misinterpretation capable of occurring to intelligence fired with a desire to pervert." *Paraiso* v. *United States,* 207 U. S. 368, 372. It was found that her attacks on the fairness of the trial and the integrity of the judge at a "public" meeting, while she was actively engaged in the conduct of the defense, rose to the level of "gross misconduct." This is not a charge of an attack made in a private conversation between friends. Whether there has been professional misconduct must depend upon the situation in which improper remarks were uttered. Thus, we would have to ignore what the Hawaii court had before it and was compelled to consider, did we not take into account the severely aggravating circumstances under which this speech was made. This attack was made at a public gathering announced as such. It was advertised as a discussion of the Smith Act trial then under way. That trial was a matter of great controversy and public interest

---

"Q. That Judge Wiig was allowing in the present Smith Act case, is that right?

"A. *The motions hadn't been argued yet.*

"Q. No, but that Judge Wiig was allowing in the present Smith Act case?

"A. Yes, he was.

"Q. That is what you were critical about? Is that right?

"A. *I was reporting. I left that to the audience.*" (Emphasis added.)

and was being reported daily on the front page of the Honolulu newspapers.[11]  It is true that the speech was made on the Island of Hawaii, not on Oahu where the trial took place.   However, Hawaii in 1952 was not the inaccessible wilds of Africa in the time of Dr. Livingston, but part of a community bound together by modern means of communication and transportation, and news could be, and was in this very case, transmitted instantaneously by radiophone to Honolulu.   See the Honolulu Star Bulletin for Dec. 15, 1952, p. 5.   The news story of petitioner's speech was in the Honolulu newspapers the next day.  *Ibid.*  The speech was made at a time when motions concerning the very evidence which petitioner was castigating were still *sub judice*.   The attacks on fairness, the descriptions of the trial as horrible and shocking, were made while the jury was open and receptive to media of communication, to the impregnating atmosphere to which juries, certainly in this country, are subjected.   Even though petitioner may not have had a provable desire, the specific intent, to affect the pending trial and its outcome, are we really required to attribute to the petitioner a child-like unawareness of the inevitability that her remarks would be reported and find their way to judge or jury, as they did?   The very next day the speech came to the judge's attention and registered so powerfully that he felt called upon to defend his conduct of the trial in open court.

The record is thus replete with evidence to support the conclusion that virtually the entire speech constituted a direct attack on the judicial conduct of this trial during its progress by one of the lawyers for the defense.   When a lawyer attacks the fairness, the evenhandedness, and

---

[11] See, *e. g.*, the Honolulu Star Bulletin for the month of December. There are also references throughout the record to the notorious nature of the trial.

the integrity of the proceedings in a trial in which he himself is actively engaged, in the inflammatory, public fashion that this record reveals, supplemented with specific attack on the presiding judge, how can the conclusion be escaped that it was not. rules of law in the abstract which were assailed, but the manner in which the processes of justice in the particular case were being conducted? More particularly, such an attack inescapably impugns the integrity of the judge. It is he who truly embodies the law as the guardian of the rights of defendants to justice under law. If a record is to be considered in its entirety, and not to be read through exculpatory glasses, the proof will be found to be conclusive that the findings of the Hawaii Supreme Court are supported by the evidence, and that, in relation to a pending trial, those findings constituted a fair basis for the conclusion that petitioner has "committed . . . gross misconduct."

Having arrived at this conclusion, our task is at an end, and the order suspending Mrs. Sawyer from the practice of law for one year should be affirmed. But throughout the opinion of MR. JUSTICE BRENNAN runs the strong intimation that if the findings are supportable, a suspension based on them would be unconstitutional. This must be the import of the opinion's discussion of a lawyer's right to criticize law. For if we find that the evidence supports the findings, no matter what we think of the wisdom of suspending an attorney on the basis of such findings, we can only reverse if the Constitution so commands. Nor does it matter whether the suspension was based on an act of the Hawaii Legislature or was an exercise of the judicial power of the Hawaii Supreme Court. The controlling question is the power of a Territory, like a State, as a whole, whatever the organ through which a State speaks. *Rippey* v. *Texas,* 193 U. S. 504, 509; *Castillo* v. *McConnico,* 168 U. S. 674, 683; *Missouri* v. *Dockery,* 191 U. S. 165, 171; *Iowa-Des Moines National*

*Bank* v. *Bennett,* 284 U. S. 239, 244; *Skiriotes* v. *Florida,* 313 U. S. 69, 79. (There is no basis for suggesting that Congress has restricted the judicial power of Hawaii so as to bar the action taken by the Supreme Court of Hawaii.)

The problem raised by this case—is the particular conduct in which this petitioner engaged constitutionally protected from the disciplinary proceedings of courts of law?—cannot be disposed of by general observations about freedom of speech. Of course, the free play of the human mind is an indispensable prerequisite of a free society. And freedom of thought is meaningless without freedom of expression. But the two great Justices to whom we mostly owe the shaping of the constitutional protection of freedom of speech, Mr. Justice Holmes and Mr. Justice Brandeis, did not erect freedom of speech into a dogma of absolute validity nor enforce it to doctrinaire limits. Time, place and circumstances determine the constitutional protection of utterance. The First Amendment and the Fourteenth Amendment, insofar as it protects freedom of speech, are no exception to the law of life enunciated by Ecclesiastes: "For everything there is a season, and a time for every purpose under heaven." And one of the instances specifically enumerated by the Preacher controls our situation: "[A] time to keep silence, and a time to speak." Eccles. 3:1, 7. Of course, a lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice. But a lawyer actively participating in a trial, particularly an emotionally charged criminal prosecution, is not merely a person and not even merely a lawyer. If the prosecutor in this case had felt hampered by some of the rulings of the trial judge, and had assailed the judge for such rulings at a mass meeting, and a conviction had followed, and that prosecutor had been disciplined for such conduct according to the

orderly procedure for such disciplinary action, is it think-
able that this Court would have found that such conduct
by the prosecutor was a constitutionally protected exer-
cise of his freedom of speech, or, indeed, would have
allowed the conviction to stand?

Only the other day, the Court of Appeals for the Sec-
ond Circuit (Swan, Madden and Hincks, JJ.) severely rep-
rimanded a United States attorney for a speech in response
to a prior invitation by alumni of a law school but made
while he was conducting an important criminal trial,
although the speech contained no reference to the pend-
ing case or to any of its defendants but merely "expati-
ated on the menace of organized crime." *United States*
v. *Stromberg,* 268 F. 2d 256, decided June 15, 1959. Even
under the most favoring circumstances—an able, fearless,
and fastidiously impartial judge, competent and scrupu-
lous lawyers, a befittingly austere court-room atmos-
phere—trial by jury of a criminal case where public feel-
ing is deeply engaged is no easy accomplishment, as every
experienced lawyer knows, if due regard is to be had to
the letter and spirit of the Constitution for such a trial.
It is difficult enough to seal the court-room, as it were,
against outside pressures. The delicate scales of justice
ought not to be willfully agitated from without by any
of the participants responsible for the fair conduct of
the trial. To be sure, a prosecutor carries a somewhat
heavier responsibility in the maintenance of the stand-
ards of criminal justice than does counsel for the defense.
But the difference in responsibility is surely not so vast
that counsel for defense has a constitutionally guarded
freedom to conduct himself as this petitioner has been
found to do, when that same conduct would bring condign
punishment for the prosecutor.

What we are concerned with is the specific conduct, as
revealed by this record, of a particular lawyer, and not
whether like findings applied to an abstract situation

relating to an abstract lawyer would support a suspension. All the circumstances we have set forth must determine judgment. Here was a public meeting addressed by counsel for the defense, haranguing a crowd on the unfairness to the defendant of the proceedings in court, with the high probability indeed almost certainty under modern conditions that the goings-on of the meeting would come to the attention of the presiding judge and the jury. It took place in a case in which public interest and public tempers had been aroused. When the story of the meeting came to the attention of the judge, he felt obliged publicly to defend his conduct. It is hard to believe that this Court should hold that a member of the legal profession is constitutionally entitled to remove his case from the court in which he is an officer to the public and press, and express to them his grievances against the conduct of the trial and the judge. "Legal trials," said this Court, "are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges* v. *California,* 314 U. S. 252, 271.

Even in the absence of the substantial likelihood that what was said at a public gathering would reach the judge or jury, conduct of the kind found here cannot be deemed to be protected by the Constitution. An attorney actively engaged in the conduct of a trial is not merely another citizen. He is an intimate and trusted and essential part of the machinery of justice, an "officer of the court" in the most compelling sense. He does not lack for a forum in which to make his charges of unfairness or failure to adhere to principles of law; he has ample chance to make such claims to the courts in which he litigates. As long as any tribunal bred in the fundamentals of our legal tradition, ultimately this Court, still exercises judicial power those claims will be heard and heeded.

Certainly courts are not, and cannot be, immune from criticism, and lawyers, of course, may indulge in criticism. Indeed, they are under a special responsibility to exercise fearlessness in doing so. But when a lawyer goes before a public gathering and fiercely charges that the trial in which he is a participant is unfair, that the judge lacks integrity, the circumstances under which he speaks not only sharpen what he says but he imparts to his attack inflaming and warping significance. He says that the very court-room into which he walks to plead his case is a travesty, that the procedures and reviews established to protect his client from such conduct are a sham. "We are a society governed by law, whose integrity it is the lawyer's special role to guard and champion." *In re Howell,* 10 N. J. 139, 142, 89 A. 2d 652, 653 (concurring opinion). No matter how narrowly conceived this role may be, it has been betrayed by a lawyer who has engaged in the kind of conduct here found by the Hawaii court. Certainly this Court, the supreme tribunal charged with maintaining the rule of law, should be the last place in which these attacks on the fairness and integrity of a judge and the conduct of a trial should find constitutional sanction.

I would affirm the judgment.

MR. JUSTICE CLARK, dissenting.

While I join in the dissenting opinion of MR. JUSTICE FRANKFURTER, I think it appropriate to add a few words by way of emphasis. Three different fact finders, including an administrative body, the Supreme Court of Hawaii, and a United States Court of Appeals, have agreed on the facts and conclusions of fact as shown by this record. Mrs. Sawyer, while of counsel in a Smith Act case then on trial before a jury, and Jack Hall, the chief defendant in the case, each made a speech before a large public

gathering sponsored by a committee for Hall's defense. In Mrs. Sawyer's speech, she charged "that horrible and shocking things were going on at said trial; that a fair trial was impossible; that all of the rules of evidence were being scrapped so the Government could make its case; that the rules of evidence and procedure were made up as the case proceeded; and that unless the trial was stopped in its tracks certain new crimes would be created." No one, least of all Mrs. Sawyer, denies that she said what she was charged with saying. Hawaii has declared her action gross misconduct violative of the Canons of Professional Ethics as adopted by its court.

But this Court says, strangely enough, that these facts are not "capable of supporting the findings" that in so doing Mrs. Sawyer "impugned the integrity of the judge presiding . . . in the said pending case . . . and thus tended to also create disrepect for the courts of justice and judicial officers generally." 41 Haw., at 422. The principal opinion says that Mrs. Sawyer's conduct was merely an innocent general attack on the Smith Act and judicial trials held thereunder.

But this broad brush leaves the whitewash too thin. For not only Mrs. Sawyer's testimony but also the statement of her own lawyer stand out clear and unanswerable. At the initial hearing in Hawaii, Mrs. Sawyer's then counsel said that hers "was a talk about what was going on in the Smith Act trial here in Honolulu. Now let's not fool ourselves about that." Her present counsel has talked the Court into doing just that and in so doing has also made a fool of our judicial processes.

To say that there is no reasonable support in the evidence for Hawaii's conclusion, as disclosed by a fair reading of the record some six and a half years later and some 5,000 miles away, is only to say that the 12 concurring officials, all of whom are trained in the law and who under oath made and passed upon these findings at trial and

on appeal, arrived at a conclusion no reasonable man could reach. By thus at this late date second-guessing those constituted authorities who in regular course have decided the facts to the contrary, the Court impugns the intelligence of the 12 individuals so participating and scatters to the winds the sincere effort of the Supreme Court of Hawaii to preserve and protect its own integrity and respect as well as that of the law. I regret that the highest court in our land has today set these winds into motion—particularly in our farthest outpost—when respect for the courts, the bar, and the law, as well as for orderly procedure, is so much needed in the world.